**In re AREMISSOFT CORPORATION SECURITIES LITIGATION.**

**In re AremisSoft Corporation.**

**Nos. 01–CV–2486 (JAP), 02–32621(JAP).**

United States District Court,
D. New Jersey.

July 31, 2002.

**112**

Lite DePalma, Greenberg & Rivas, LLC, Joseph J. DePalma (JD–7697), Newark, NJ, Liaison Counsel for Plaintiffs and the Class.

Schiffrin & Barroway, LLP, Richard S. Schiffrin, Stuart L. Berman, Bala Cynwyd, PA, Lead Counsel for Plaintiffs and the Class.

Milberg Weiss Bershad Hynes & Lerach LLP, Melvyn I. Weiss, Francis P. Karam, Daniel R. Altman, New York City, Berger & Montague, P.C., Todd Collins, Jacob Goldberg, Philadelphia, PA, Executive Committee for Plaintiffs and the Class.

The Olsen Law Firm, Kurt Olsen, Esq., Washington, DC, Keller Rohrback, LLP, Lynn Lincoln Sarko, Esq., Seattle, WA, for Plaintiffs.

Fulbright & Jaworski, LLP, Hal Hirsch, Esq., New York City, Marquette Financial Companies, Donald E. Benson, Minneapolis, MN, for the Equity Committee.

Davis Polk & Wardwell, Eric Grossman, Esq., Wallmuth, Maher & Deutsch, Paul R. DeFilippo, Esq., New York City, James N. Lawlor, Esq., Newark, NJ, for Defendant, AremisSoft.

Margaret L. Jurow, Esq., Newark, NJ, United States trustee.

Butler, FitzGerald & Potter, P.C., David J. McCarthy, Esq., Rutherford, NJ, Kessler,

Young & Logan, P.C., Janet Simmons Stemler, Esq., Long Beach, CA, Attorneys for Defendants Roth Capital Partner, LLC, H.C. Wainright, and Wells Fargo Securities.

Riker, Danzig Sherer Hyland & Peretti, LLP, Michael O'Mullan, Esq., Morristown, NJ, Long & Levit, LLP, Edward Donahue, Esq., San Francisco, CA, for Defendant, Scott E. Bartel.

McCarter & English, William T. Reilly, Esq., Newark, NJ, for Defendant, PKF.

PISANO, District Judge.

This is a consolidated class action brought on behalf of all purchasers of common stock of the AremisSoft Corporation ("AremisSoft"). The First Amended and Consolidated Class Action Complaint (the "Complaint") alleges that the Defendants issued false and misleading statements concerning AremisSoft's earnings and streams of revenue during the Class Period, April 22, 1999 through July 27, 2001, inclusive, in violation of Sections 10 and 20(a) of the Securities and Exchange Act of 1934, and Sections 11 and 15 of the Securities Act of 1933. The parties agreed to a settlement (the "Settlement") on or about March 15, 2002.

Currently pending before the Court are unopposed motions to: (1) certify the Class; (2) approve the Settlement; and (3) approve the application for the award of attorneys' fees and reimbursement of expenses (the "Fee Application"). For the reasons set forth below, the Court grants the motion to certify the class, approves the Settlement, and approves the Fee Application.[1]

## I. INTRODUCTION

This case presents a panoply of complex legal issues resulting in an innovative application of traditional bankruptcy law and principles controlling class action settlement. According to the Complaint, defendants

---

1. In conjunction with these motions, the parties made a motion to approve the Chapter 11 Plan of Reorganization and a motion to appoint the Trustee of the Liquidation Trust, which is a product of the Settlement and the Plan of Reorganization. The Court approved the Plan of Reorganization by order dated July 10, 2002. In accordance with the Submission of the Equity Committee and Lead Class Counsel With the Support of Parties in Interest, the Court appoints, by separate order, Joseph P. LaSala and Fred S. Zeidman as Co Trustees of the Liquidating Trust.

perpetrated a massive fraud by causing AremisSoft to artificially inflate the value of its stock and issue false and misleading public statements that overstated earnings and reported streams of income that did not exist. The Complaint further alleges that AremisSoft insiders sold their holdings at these artificially high prices, and absconded to foreign jurisdictions with hundreds of millions of dollars. The instant lawsuit followed.

As is often the case in securities class actions, AremisSoft could not conduct its ordinary business under the cloud cast by this litigation. Because the Class sought damages far exceeding AremisSoft's assets and projected revenues, bankruptcy appeared inevitable. Had AremisSoft filed for bankruptcy under these circumstances, it would have likely foreclosed any possibility for defrauded investors to obtain redress for their injuries stemming from the alleged fraud. In short, the class action would have only succeeded in destroying a business and insuring that investors received little or no return on their investment in AremisSoft.

However, the attorneys crafted the innovative settlement, at issue in this motion, to avoid such a result. In March 2002, counsel brought before this Court a pre-negotiated Plan of Reorganization (the "Plan"), under Chapter 11 of the Bankruptcy Code, in conjunction with a plan to settle the class action. According to the Plan and Settlement, AremisSoft would transfer all of its assets, consisting mainly of its manufacturing and hospitality software business, to its former subsidiary, SoftBrands, Inc. ("SoftBrands"). Then, upon this Court's certification of the Class, approval of the Settlement and the Plan, SoftBrands would issue SoftBrands common stock to the Class as compensation for its injuries. In return, the Class would release AremisSoft and SoftBrands from all of its claims. In this way, the attorneys hoped to use a traditional Chapter 11 reorganization as a means to compensate injured investors, rather than foreclose them from redress, while allowing the defendant-corporation to continue to pursue profitable business activities.

In addition, the Settlement creates a vehicle through which the Class can further pursue redress for their injuries. The Plan and Settlement form a trust, created primarily for the Class's benefit, that will liquidate AremisSoft's remaining assets and prosecute claims on the Class's behalf against other, third-party defendants. Prosecution of these remaining claims will have two components. First, the trust will continue litigation of claims against third parties within the United States. Second, the trust will endeavor to recover monies that certain Defendants concealed in foreign jurisdictions.

As it does with other settlements, the Court favors the parties' resolution of this case. *See In re General Motors Corp. Pick–Up Truck Fuel Tank Products Liability Litig.,* 55 F.3d ·768, 784 (3d Cir.1995) (observing that the law favor settlements). The Court is aware that, to some, this collaborative effort between adversaries may smack of collusion. However, the law provides for safeguards against potential collusion by requiring the Court to protect the interest of the class by conducting an independent review as to the reasonableness and fairness of the settlement. *See In re Ikon Office Solutions, Inc. Sec. Litig.,* 194 F.R.D. 166, 174 (E.D.Pa.2000). As the following analysis shows, the Court is confident that this Settlement is the product of zealous advocacy and arm's–length negotiation. The Court finds support for this confidence from the manner in which attorneys' fees shall be awarded. First, the fact that Plaintiffs' Counsel seek fees in the form of SoftBrands's stock is strong evidence of counsel's common interests with the Class. Second, the absconding Defendants have attempted to hide their illicit profits by scattering them across the globe. This element of international intrigue will make recovery of those funds exceedingly difficult. However, the Settlement closely aligns the pecuniary interests of the Class with that of Plaintiffs' Counsel and the Co Trustees, ensuring a diligent pursuit of those funds on behalf of the Class. These facts, and others, demonstrate that this innovative settlement, although the result of cooperation by adversaries, meets the stringent requirements of fairness and reasonableness to the Class.

## II. PROCEDURAL HISTORY

This litigation was commenced on May 24, 2001, with the filing of several class action complaints against AremisSoft Corporation ("AremisSoft" or the "Corporation"), Boys Poyiadjis ("Poyiadjis") and Lycourgos Kyprianou ("Kyprianou").[2] All of these cases were ultimately assigned to this Court.

On or about July 23, 2001, several shareholders filed notices evidencing their intent to move to consolidate the several actions pursuant to Rule 42 of the Federal Rules of Civil Procedure, to be appointed Lead Plaintiffs, and to seek approval of their requested Lead Counsel pursuant to § 21D(a)(3)(B) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u–4, as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

Before the Lead Plaintiffs' motions were decided, counsel for the respective shareholder movants entered into a joint stipulation dated August 23, 2001, concerning the appointment of Lead Plaintiffs and the approval of Lead Plaintiffs' selection of Lead Counsel, an Executive Committee, and Liaison Counsel.

By court order dated August 27, 2001, the several cases against AremisSoft, Poyiadjis and Kyprianou were consolidated under the caption *In re AremisSoft Corporation Securities Litigation,* Civil Action No. 01–2486(JAP). In addition, pursuant to the August 23, 2001 joint stipulation, this Court appointed class members George D. Bjurman & Associates, Ralph DeLuca, Keystone Trading Partners, and Andy Win as Lead Plaintiffs, and approved their selection of Schiffrin & Barroway, LLP as Lead Counsel, Milberg Weiss Bershad Hynes & Lerach LLP and Berger & Montague, P.C. as members of an Executive Committee, and Lite DePalma Greenberg & Rivas, LLC as Liaison Counsel (collectively "Plaintiffs' Counsel") for the putative class.

The First Amended and Consolidated Class Action Complaint (the "Complaint") was filed on March 15, 2002, on behalf of a proposed class consisting (with certain exclusions) of all persons who purchased or acquired AremisSoft securities on the open market or otherwise between April 22, 1999 through and including July 27, 2001 (the "Class Period") and were damaged thereby (the "Class"). The Defendants named in the Complaint are: AremisSoft, Kyprianou, Poyiadjis, Noel R. Voice, Michael A. Tymvios, M.C. Mathews, and Dr. Paul I. Bloom, all former top executives of AremisSoft; Scott E. Bartel, AremisSoft's outside counsel and de facto operating officer; Kurt Sedlmayer (also known as Kurt Sedlmeyer), a purported independent sales agent for AremisSoft and a director of Spahn & Partners Finanz Consult GMBH; PKF United Kingdom, AremisSoft's independent auditor; Roth Capital Partners, Inc. f/k/a Cruttenden Roth, Inc., the lead underwriter of the AremisSoft's initial public offering; and other underwriters, including, Advest, Inc. C.E. Unterberg, Towbin, Value Investing Partners, BlueStone Capital Partners, L.P., ISG Capital Markets, LLC, John G. Kinnard & Company, Incorporated, Pennsylvania Merchant Group; RM Stark Co., Inc., Trautman, Kramer & Company, Inc., First Security Van Kasper, and H.C. Wainwright & Co., Inc.

Also on March 15, 2002, after months of negotiations toward the possibility of settling this Action, AremisSoft filed a petition for relief under Chapter 11 of the Bankruptcy Code. In connection with that petition (and in furtherance of a main goal of a settlement later entered by counsel for the Company and the Class), AremisSoft transferred all of the manufacturing and hospitality software business formerly held by the Company to its principal operating subsidiary, SoftBrands, Inc. ("SoftBrands"). On March 21, 2002, the parties to the proposed settlement signed a

---

**2.** *Gunner Tolderlund v. AremisSoft Corporation, et al.,* C.A. No. 01–CV–2486; *Keystone Trading Partners v. AremisSoft Corporation, et al.,* C.A. No. 01–CV–2487; *Martin Chopp v. AremisSoft Corporation, et al.,* C.A. No. 01–CV–2607; *Andrew Geiger v. AremisSoft Corporation, et al.,* C.A. No. 01–CV–2803; *Ben Burgoyne v. AremisSoft Corpo-* ration, et al., C.A. No. 01–CV–2979; *Michael Schwartz v. AremisSoft Corporation, et al.,* C.A. No. 01–CV2871; and *Ralph Duff v. AremisSoft Corporation, et al.,* C.A. No. 01–CV–2979. These actions collectively shall be referred to herein as the "Action."

stipulation of settlement as to this Action.[3] The proposed Settlement is between the Class and AremisSoft. The Action will remain pending against non-settling defendants, particularly the absconding defendants, and certain third-party defendants named by AremisSoft.

Also on March 21, 2002, AremisSoft and SoftBrands filed a Joint Proposed Plan of Reorganization (the "Plan") and a Disclosure Statement concerning that Plan. The Plan, negotiated with Plaintiffs' Counsel as part of the Settlement, allowed for (I) the issuance of SoftBrands common stock to Class Members and other equity holders of AremisSoft shares; (ii) the cancellation of all existing equity interests in AremisSoft; and (iii) the creation of a Liquidation Trust to allow Class Members to pursue certain causes of action and liquidate certain other assets that AremisSoft currently owns.

The Settlement and Plan provide that the Class will receive the following in settlement and release of their claims against AremisSoft: (I) sixty and one-half percent (60.5%) of the common stock representing the equity and voting rights of SoftBrands (an amount that shall represent no less than fifty percent (50%) of fully-diluted SoftBrands common stock); and (ii) ninety percent (90%) of the Net Trust Recoveries, that is, the amount by which the aggregate amount recovered by the Trust exceeds the aggregate amount of Trust Expenses and Reserves (as each are defined in the Liquidating Trust Agreement attached as Exhibit A to the Plan).

The Settlement and Plan further provide that: (I) beneficial holders of record of AremisSoft common stock on the Distribution Record Date (as defined in the Plan, and including Class Members) shall receive common stock representing thirty-nine and one-half percent (39.5%) of the equity and voting rights of SoftBrands; (ii) executive management and employees of SoftBrands shall receive options that represent twenty-one percent (21%) of the outstanding common stock of SoftBrands on the Effective Date of the Plan; and ©) SoftBrands shall receive ten percent (10%) of the Net Trust Recoveries. The Settlement and Plan also both provide that AremisSoft shall transfer certain other assets (as set forth in those documents) and all claims it holds to the Trust. Any and all claims arising out of the purchase of AremisSoft securities during the Class Period, which have been, or could be asserted against any other individual or entity will be assigned to, and for the benefit of, the Trust. The net proceeds from all claims transferred to the Trust will be distributed to the beneficial members of the Trust (including Class Members).

The Settlement contains a proposed Plan of Allocation establishing the method by which the Settlement Securities (SoftBrands common stock and Net Trust Recoveries minus approved costs, fees and expenses) will be distributed to Class Members submitting acceptable proofs of claim. The Settlement provides that otherwise eligible Class Members who have not requested exclusion from this Action and who do not submit acceptable proofs of claim will be bound by the Settlement, the assignment of claims, and any Order and Final Judgment of the Court dismissing this Action.

On March 22, 2002, this Court: (I) granted AremisSoft's motion to withdraw the reference of this Action to the Bankruptcy Court (ensuring that this Court would maintain jurisdiction over the entire matter); and (ii) entered a Consent Order granting Lead Plaintiffs limited relief from the protections afforded by the Bankruptcy Code's automatic stay in order to allow AremisSoft and the class action plaintiffs to take the steps necessary to implement the proposed Settlement. On the same day, this Court preliminarily certified the Class and scheduled a fairness hearing to determine the fairness, adequacy and reasonableness of the Settlement.

On May 28, 2002, this Court approved the Company's Disclosure Statement and scheduled a Confirmation Hearing concerning the Plan. The Fairness and Confirmation Hearings were both held on July 1, 2002. The order approving the Plan becomes effective

---

**3.** On June 19, 2002, this stipulation (the "Settlement") was revised to conform with certain bankruptcy documents.

upon the entry of the order which is the subject of this opinion.

## III. FACTUAL BACKGROUND [4]

Prior to 1998, AremisSoft was known as LK Global Information Systems, B.V. ("LK Global"), a Netherlands corporation that Kyprianou founded in 1978. LK Global derived the majority of its revenues from selling healthcare systems in the United Kingdom. In October 1997, LK Global merged into Juno Acquisitions, a Nevada shell company, to gain a U.S. listing, and changed its name to AremisSoft in 1998.

During the Class Period, Poyiadjis and Kyprianou, among others, sold millions of their AremisSoft shares, sometimes through secret transactions. The AremisSoft stock proceeds were routed through a U.S. broker-dealer and Swiss Banks and ultimately deposited in bank accounts in the Isle of Man. Plaintiffs allege that Defendants Kyprianou and Poyiadjis profited immensely from the artificial inflation of AremisSoft's stock prices.

On April 22, 1999, AremisSoft, pursuant to a Form S 1/A registration statement ("Registration Statement") filed with the Securities Exchange Commission ("SEC") and a Form 424B1 final prospectus filed with the SEC on April 23, 1999 (the "Final Prospectus" and together with the Registration Statement, the "Offering Documents"), sold 3.3 million shares of AremisSoft common stock at $5.00 per share in an Initial Public Offering (the "IPO"). Defendants Poyiadjis and Kyprianou, among other AremisSoft directors, signed the Registration Statement.

In the Offering Documents, AremisSoft touted its software development facility in New Dehli, India ("New Dehli Facility"), claiming that the facility provided the Company with "significant organizational efficiencies and cost advantages in software-development and support." The Complaint alleges that those critical representations, among others in the Offering Documents, were false and misleading. The Complaint also alleges that the Offering Documents materially over-

stated the size and development capacity of the New Dehli Facility, including the number of employees. By way of specific example, the Complaint alleges that the Company's claim, set forth in the Offering Documents, that the New Dehli facility employed 186 persons, (36% of AremisSoft's workforce), was materially overstated.

In addition, the Complaint alleges that the Offering Documents contained other material false and misleading statements concerning AremisSoft's customers. For example, the Offering Documents falsified customers, representing that the Company had 2,000 healthcare software customers, when in reality the Company had fewer than 300 at the time of the Offering. According to the Complaint, the Offering Documents grossly overstated the number of total customers as 5,000 and boasted of a material number of "representative customers" with which AremisSoft had no business at the time of the IPO.

The Complaint also alleges that Plaintiffs and the other Class Members acquired shares of AremisSoft pursuant to the false and misleading Registration Statement and received, or were legally entitled to receive, a copy of the Final Prospectus.

According to the Complaint, subsequent to the IPO and throughout the Class Period, AremisSoft, by and through, among others, Kyprianou and Poyiadjis, materially overstated the consolidated revenue and earnings the Company publicly reported by including fictitious revenues from, among others, the Company's Emerging Markets Group ("EMG"), a wholly owned Cyprus-based subsidiary, and an agreement to automate the nationwide healthcare system of Bulgaria (the "Bulgarian Contract"). In addition, Plaintiffs allege that during the Class Period, the Company materially misrepresented the values of certain acquisitions including, but not limited to, E-nnovations.com, E ChaRM India Pvt. Ltd., and Denon International Ltd.

On December 16, 1999, AremisSoft issued a press release announcing its acquisition of

---

4. The following factual recitation is culled from the Complaint. Defendants do not concede this version of the facts.

E-nnovations.com PVT Ltd. ("E-nnovations.com"), a software development company based in India, for a purported $14.5 million in cash. According to a share purchase agreement dated December 17, 1999, signed by Defendant Kyprianou, and attached as an exhibit to a current report on Form 8–K, which the Company filed with the SEC on December 30, 1999, AremisSoft stated that the shareholders of E-nnovations.com were to tender 100% of the outstanding shares of E-nnovations.com to AremisSoft, but falsely stated the purchase price at $14,539,000. The Complaint alleges that the disclosure of the E-nnovations.com deal was a sham, intended to create the illusion that AremisSoft was growing at a rapid pace. The Class maintains that these statements were false because AremisSoft failed to disclose that E-nnovations.com was comprised of a combination of several tiny Indian software development companies that AremisSoft had actually purchased for less than $300,000.

On December 17, 1999, AremisSoft issued a press release announcing "the signing of a $37.5 million agreement to automate the nationwide healthcare system of Bulgaria" (the "Bulgarian Contract"). According to the press release, the Bulgarian Contract was initiated by the National Health Insurance Fund, of Bulgaria ("NHIF") and would be "recognized over an 18 to 24–month installation period, beginning in January 2000." The Company again touted the importance of the Bulgarian Contract in a registration statement on Form S–1/A, filed with the SEC on March 15, 2000, and in its annual report on Form 10–K for the year ended December 31, 1999, which was filed with the SEC on March 30, 2000 ("1999 10–K"). The Complaint alleges these documents falsely represented the value of the Bulgarian Contract as $37.5 million.

In addition, the Company stated during a March 28, 2001 conference call with a securities analyst, "The $37.5 million [contract] is the first phase of a two to three hundred million dollar program which is multiple years, and that would be to install the systems you see here in all the different hospitals and pharmacies and labs."

According to the NHIF, itself, AremisSoft dramatically overvalued the Bulgarian Contract. The Bulgarian Contract clearly provides that the Company was to receive 7,078,000 Bulgarian Leva, ($3,686,000 USD), for completion of the first two phases of a four-phase program—not the $37.5 million the Company disclosed.

AremisSoft failed to disclose to investors that the NHIF would open future phases of the contract to competitive bidding. Paragraph 1.2 of the Bulgarian Contract states that "the parties agree to start negotiations of Application Software–Integrated Information System PHASE 3 and PHASE 4, which negotiation shall be in conformity with the provisions of Law for Public Offers." The NHIF stated that its contract with AremisSoft, including a $255,000 "interim information system," is for no more than a total of $3.94 million, and "the contract obliges AremisSoft to submit a bid if a bidding procedure is announced for Phase 3 and 4 and to offer a price for those phases not higher than 8,400,000 BGL [Bulgarian Leva]."

The Bulgarian Contract did not entitle AremisSoft to payments from the NHIF worth $37.5 million. As was ultimately admitted by the Company in a current report on Form 8 K, filed with the SEC on December 4, 2001, the Company was only awarded the first two phases of the Bulgarian Contract, worth only $3.9 million. By January 1, 2001, the NHIF eliminated even the possibility of AremisSoft's bidding on portions of the project potentially worth $29 million. In a May 17, 2001 press release, the Company attempted to blame any discrepancy on "differences in nomenclature," the language barrier, and unscrupulous short-sellers and reporters.

The Complaint further alleges that, in addition to overstating the value of the Bulgarian Contract, the Company also used it improperly and materially to inflate materially its revenues in fiscal 2000, claiming $7.1 million in revenue relating to the Bulgarian Contract for the fiscal year ended December 31, 2000. Ultimately, once the fraud of the Company was revealed, investors became aware that AremisSoft had received only $1.7 million from the NHIF.

On March 30, 2000, AremisSoft filed its Form 10–K with the SEC for the year ended December 31, 1999 ("1999 10–K"), in which the Company reported revenues of $73,386,000, net income of $13,280,000, and diluted earnings per share of $0.99 for the year ended December 31, 1999. Plaintiffs allege that it was revealed after the end of the Class Period, that at least $38 million of EMG related revenue, or 52% of Aremis-Soft's fiscal 1999 revenue, was fictitious. The 1999 10–K was signed by Defendants Poyiadjis, Kyprianou, and others.

During 2000, AremisSoft, as it had done in 1999, allegedly continued to overstate its financial results. As would be revealed by the Company on December 4, 2001, AremisSoft reported approximately $90 million in fictitious revenues to the investing public during 2000, thereby overstating the Company's revenues by 73% and inflating its stock price.

According to AremisSoft's December 4, 2001 revelations, during 2000, six purported independent sales agents of AremisSoft products and services—Orimix, Agroservices, Poche & Co. GmbH, Zen Trade, Gravitas, and Con Imp.—accounted for $88.5 million of the approximately $90 million in fictitious 2000 revenues in purported sales of the Company's products and services to thirty-seven customers throughout Europe. The Company's current management was only able to contact representatives of two of the purported sales agents, Orimix and Agroservices, which both stated that they did not make any sales for AremisSoft. In fact, Orimix, a Croatian company, is a steel trader, and Agroservices, a company located in Monaco, is a meat supply company. Several purported customers stated that they had not made purchases from any of the sales agents or AremisSoft.

In 2000, the Company allegedly reported approximately $5.4 million in fictitious revenue from the Bulgarian Contract alone. Under the Bulgarian Contract, AremisSoft reported an additional $1–2 million in the first quarter of 2001, ended March 31, 2001, which Plaintiffs allege was also fictitious.

On May 17, 2001, articles in the New York Times and TheStreet.com raised questions concerning the true value of the Company's Bulgarian Contract, stating that, contrary to the Company's December 17, 1999 announcement and subsequent public representations reiterating its $37.5 million value, the Bulgarian Contract had a guaranteed value of less than $4 million. Following the publication of these articles, trading in AremisSoft stock was halted on May 17, 2001, before the opening of trading on the Nasdaq stock market ("Nasdaq"), pending a statement from the Company regarding the Bulgarian Contract.

On May 17, 2001, AremisSoft issued a press release attempting to blame any public confusion concerning the value of the Bulgarian Contract on "a difference in nomenclature that was used by various parties to describe the contract." The press release also blamed short sellers and misinformed reporters for disseminating inaccurate and misleading information about AremisSoft and the Bulgarian Contract. The May 17, 2001 press release further misstated that, under the Bulgarian Contract, the Company had received, at that date, total payments from the NHIF in excess of $7 million.

On May 18, 2001, when trading in Aremis-Soft resumed, the price of its common stock fell $1.30 per share, or 9.8%, to close at $11.98 per share on volume of more than 9.5 million shares.

On July 24, 2001, the Company issued a press release stating that it had been delayed in the preparation of its financial results for the 2001 second quarter ended June 30, 2001 as a result of "numerous acquisitions and the increasing complexity and geographical diversity of the business." Thereafter, on Friday, July 27, 2001, the last day of the Class Period and the last day AremisSoft traded on Nasdaq, the Company's stock closed at $11.19 per share.

On Monday, July 30, 2001, Nasdaq halted trading in AremisSoft for "news pending." On July 31, 2001, Nasdaq announced that the trading halt status had been changed to "additional information requested" from Aremis-Soft. Also on July 31, 2001, AremisSoft announced for the first time that the Company was cooperating with an SEC investigation into, among other things, the Bulgarian Contract. The Company announced that it had

engaged independent auditors PKF, formerly known as Pannell Kerr Forster, to conduct a special review of the payments AremisSoft received in connection with the Bulgarian Contract. (PKF later advised AremisSoft that it was only able to confirm the Company's receipt of $1.7 million from the NHIF.) The Company further announced the resignation of Defendant Kyprianou as Chairman and Co Chief Executive Officer ("CEO") and the resignation of Defendant Tymvios as Chief Financial Officer ("CFO").

On August 14, 2001, the Company announced the resignations of other senior AremisSoft officers including the President of the EMG, the Senior Vice President of India Software Development Facilities, and key controllers of the Company's India-based corporate accounting group.

On August 30, 2001, after a month-long trading halt, AremisSoft was delisted from Nasdaq. That same day, shares of AremisSoft began trading on the "Pink Sheets," and immediately fell from $11.19 per share, the closing price on Friday, July 27, 2001, to $1 per share with 16.5 million shares changing hands.

According to the class allegations, the Company failed fully to reveal the extent of its misrepresentations and fraudulent scheme until after the Class Period. On December 4, 2001, in a Form 8–K filed with the SEC, the Company admitted, *inter alia,* that it had been awarded only the first two phases of the Bulgarian Contract, worth $3.9 million, and that it was still able to substantiate only $1.7 million of the $7.1 million in revenue reported by the Company on the Bulgarian Contract in 2000. The Company also disclosed that it was unable to substantiate approximately $90 million of consolidated revenue reported by the EMG unit in 2000 or the expenses associated with EMG. Additionally, the Company disclosed that certain of its acquisitions were recorded at values "not substantiated by information developed in the [Company's internal] investigation."

## IV. DISCUSSION

■ Currently before the Court are motions to approve the Settlement, certify the Class, and approve the Fee Application.

"The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *In re General Motors Corp. Pick Up Truck Fuel Tank Litig.,* 55 F.3d 768, 784 (3d Cir.1995) (hereinafter *"In re Gen. Motors Corp."*). Nonetheless, the court has an obligation to protect class members' interests. *See "In re Ikon Office Solutions, Inc. Sec. Litig.,* 194 F.R.D. 166, 174 (E.D.Pa.2000) (hereinafter *In re Ikon"*). Before approving a settlement, the court must examine whether the parties issued adequate notice to prospective class members. *See id.;* Fed.R.Civ.P. 23(c)(2). The court must also properly certify a class under Federal Rules of Civil Procedure 23(a) and (b)(3). *See In re Gen. Motors Corp.,* 55 F.3d at 794–97; *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 148 F.3d 283, 307–09 (3d Cir.1998) (hereinafter *"In re Prudential"*). Finally, the court must decide whether the proposed settlement itself is fair to settling parties and relevant third parties. *See* Fed.R.Civ.P. 23(e). Although the court may acknowledge that the proposed class is a settlement class, it may not reach the fairness question if there is not a proper class and may not substitute the fairness inquiry for the Rule 23(a) and (b) inquiry. *See In re Prudential,* 148 F.3d at 308; *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 620–21, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

### A. Adequacy of Notice

■ "In order to satisfy due process, notice to class members must be 'reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Lachance v. Harrington,* 965 F.Supp. 630, 636 (E.D.Pa. 1997) (quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). This determination must be made before inquiry into the merits. *See In re Prudential,* 148 F.3d at 326–27; *Lachance,* 965 F.Supp. at 636; *see also* Fed.R.Civ.P. 23(e) (barring settlement of class action unless proper notice is made). In Rule 23(b)(3) actions, class members must receive "'the best notice practicable under

the circumstances,' " including individual notice to all shareholders who can be identified through reasonable effort. Fed.R.Civ.P. 23(c)(2); *see also Lachance,* 965 F.Supp. at 636.

██ Plaintiffs' Counsel sent the best notice practicable to prospective Class Members. From the inception of the class action through June 14, 2002, over 35,000 notices were sent to potential Class Members. (Affidavit of Shandarese Garr, (hereinafter, "Garr Aff.") (attached as Ex. C. to Affidavit of Richard S. Schiffrin)). In addition, Plaintiff's Counsel caused publication of notice of the Action in the national edition of the Wall Street Journal and the international edition of the International Herald Tribune. Such efforts were reasonably calculated to reach identifiable members. *See In re Ikon,* 194 F.R.D. at 175 (holding that mass mailing to potential class members in combination with publication in the Wall Street Journal and International Herald Tribune was adequate method of notification).

Furthermore, the substance of the notice was adequate. The notice clearly set forth its purpose, the nature of the Action, class membership criteria, the recovery sought, the nature of the settlement, the attorneys' fees sought, and notice of all hearings. The notice provides that any prospective Class Members who do not wish to be included in the settlement class must submit a written request to be excluded. As of June 3, 2002, only six potential Class Members requested exclusion from the class. Garr Aff. ¶ 7. Such notice meets the requirements of the due process and Rule 23. *See In re Ikon,* 194 F.R.D. at 175 (holding that substance of notice met Rule 23 requirements where it set forth the settlement terms, the potential maximum request for attorneys' fees, the names and contact information of relevant attorneys, the proposed release and the plan of allocation.)

### B. Class Certification

██ The parties seek to certify a settlement class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3).

### 1. Rule 23(a)

Rule 23(a) requires that a class satisfy the elements of numerosity, commonality, typicality, and adequacy.

### a. Numerosity

A class must be so "numerous that joinder of all class members is impractical." Fed. R.Civ.P. 23(a)(1); *see also In re Ikon,* 194 F.R.D. at 174–75 "Impracticality does not mean impossibility of joinder and the court should make common sense assumptions on this issue." *In re Ikon,* 194 F.R.D. at 174–75 (citations omitted). The large number of shares involved and the typically small amount of individual damages render securities actions particularly appropriate to class actions. *See Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir.1985).

Joinder of all Class Members is impracticable in this case. As of April 25, 2001, approximately 39 million shares of the Company's common stock were outstanding. (Compl., ¶ 189.) Furthermore, AremisSoft common stock was actively traded throughout the Class Period. This wide disbursement of millions of AremisSoft shares led to a potential class of 35,000 members. Joinder of all such plaintiffs is impracticable, and, thus, the numerosity requirement is met.

### b. Commonality

A class must share common questions of law and fact. *See* Fed.R.Civ.P. 23(a)(2). "A finding of commonality does not require that all class members share identical claims, and indeed factual differences among the claims of the putative class members do not defeat certification." *In re Prudential,* 148 F.3d at 310 (citation omitted). Particularly, this factor requires only that the named plaintiffs share " 'at least one question of fact or law with the grievances of the prospective class.' " *See In re Ikon,* 194 F.R.D. at 176 (citations omitted).

Common questions of law and fact exist in this case. The factual gravamen of the Complaint is that Defendants issued false and misleading statements, both in connection with AremisSoft's Initial Public Offering and thereafter, causing AremisSoft stock to trade

at artificially inflated prices during the Class Period. Moreover, Lead Plaintiffs' claims, and the Class's claims, arise under, among other provisions, § 11 of 1933 Act and § 10(b) of the 1934 Act. Thus, because the claims of all Class Members arise from the same nucleus of operative facts and are brought pursuant to the same legal theories, the commonality requirement of Fed.R.Civ.P. 23 is met.

### c. Typicality

The third requirement is that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). "[T]ypicality entails an inquiry whether 'the named plaintiff's individual circumstances are markedly different ... or the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." *Eisenberg,* 766 F.2d at 786 (quoting *Weiss v. York Hosp.,* 745 F.2d 786, 809 n. 36 (3d Cir.1984)). That is, the theories of the named plaintiffs must not be in conflict with those of the putative members. *See In re Prudential,* 148 F.3d at 311; *Baby Neal,* 43 F.3d at 57. Generally, a plaintiff's claim is typical of a class if it arises from "the same event or course of conduct which in turn had given rise to the claims of other class members[.]" *In re Data Access Sys. Sec. Litig.,* 103 F.R.D. 130, 139 (D.N.J. 1984) (citations omitted); *see also In re Scott Paper Co. Sec. Litig.,* 142 F.R.D. 611, 615 (E.D.Pa.1992).

The claims Lead Plaintiffs assert, and the defenses that would be asserted against Lead Plaintiffs, are typical of those that would be asserted for and against the Class. Again, all claims arise from the same nucleus of operative facts: Defendants' misstatements artificially inflated AremisSoft's stock prices. Additionally, Lead Plaintiffs brought their claims under § 11 and § 10b(5), just as Class Members would have. Furthermore, the unlawful acts that Defendants allegedly committed affected the entire Class in the same way, and the legal claims flowing from those allegations are the same for Lead Plaintiffs and the entire Class. Thus, typicality exists.

### d. Adequacy

Finally, the representative parties must "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). Adequacy requires an evaluation of two issues. It first "serves to uncover conflicts of interest between named parties and the class they seek to represent"; it also "tests the qualifications of the counsel to represent the class." *In re Prudential,* 148 F.3d at 312 (citations omitted); *see also In re Gen. Motors Corp.,* 55 F.3d at 800 (focusing on same issues). The adequacy of representation inquiry requires special attention for settlement classes. *See In re Prudential,* 148 F.3d at 308; *In re Gen. Motors Corp.,* 55 F.3d at 801. The court must consider whether class counsel has adequate experience, "vigorously prosecuted the action," and "acted at arm's length from the defendant." *In re Gen. Motors,* 55 F.3d at 801. Both aspects of the inquiry are met here.

First, no party has identified any conflicts between the Lead Plaintiffs and those they seek to represent. Similarly, the Court's own examination has failed to reveal any such conflicts. The Court acknowledges that certain plaintiffs will have different measures of damages. However, these differences are dealt with in the Plan of Allocation, described *infra.* *See In re Ikon Solutions, Inc.,* 194 F.R.D. at 176 (noting plan of allocation addressed discrepancies in plaintiffs' damages).

Second, counsel has adequately represented the class and its interest. Plaintiffs' Counsel are highly experienced in securities class action litigation. (*See* Affidavit of Richard S. Schiffrin, Exs. E through J (hereinafter Schiffrin Aff.).) As demonstrated in the respective firm resumes attached to the Schiffrin Affidavit, the attorneys acting as counsel to the Class in this case have successfully prosecuted numerous class actions throughout the United States, and are clearly competent to conduct this Litigation. They have demonstrated their expertise in this matter via their ability to proceed efficiently and professionally even under the time constraints of this large, complex case.

Furthermore, Plaintiffs' Counsel diligently and aggressively represented their clients and the Class before this Court and in the

negotiations with AremisSoft's counsel. The creative settlement devised by counsel demonstrates the vigor of their representation. Without such creativity, Class Members would have likely been relegated to squabbling over the remains of a liquidated defendant. Instead, Plaintiff Counsels' aggressive representation resulted in the Class owning stock in a viable, and hopefully profitable, new corporate entity intended to provide a return on Class Members' original investment. Counsels' ability to devise a settlement so beneficial to the Class not only further demonstrates their diligence, but also evidences that they conducted their negotiations with the Defendants at arm's-length. The settlement terms, and the benefits the Class could derive from it, erase any fears that counsel failed in their obligations to the Class. The adequacy requirement of Fed. R.Civ.P. 23 is thus met.

### 2. Rule 23(b)(3)

The parties seek certification under Rule 23(b)(3), "which requires that common questions of law or fact predominate over individual questions and that the class action structure be the superior method of managing the case." *In re Ikon,* 194 F.R.D. 166, 177.

### a. Predominance

The predominance test is readily met in most securities fraud actions. *See In re Prudential,* 148 F.3d at 314. "Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is, in its broad outlines, actionable, which is not defeated by slight differences in class members' positions, and that the issue may profitably be tried in one suit." *Blackie v. Barrack,* 524 F.2d 891, 902 (9th Cir.1975). Although individual damage claims will differ depending on when and what type of stock was acquired, these issues cast no doubt on the finding of predominance. *See, e.g., Eisenberg,* 766 F.2d at 786; *In re Data Access Sys.,* 103 F.R.D. at 138–40, 142.

Common questions of law and fact predominate in this case. Any case brought by the Plaintiffs or Class Members would necessarily address the Defendants' alleged misrepresentations and omissions, and whether the Defendants acted with the requisite intent, and the effect of the Defendants' alleged conduct on the price of AremisSoft's stock. Furthermore, these claims would be brought under federal securities laws. Because this case turns upon allegations of a common course of conduct on the part of AremisSoft and the other Defendants that injured the Class, common issues of law and fact predominate.

### b. Superiority

A class action must also be "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R.Civ.P. 23(b)(3). Factors to be examined in determining superiority include:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (©) the desirability or undesirability of concentrating the litigation in the particular forum; [and] (D) the difficulties likely to be encountered in the management of a class action.

*Id.* As only a settlement class is at issue, the Court need not inquire into whether a class action would be manageable at trial. *In re Ikon,* 194 F.R.D. at 178, n. 14 (citing *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 620, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)).

Consideration of the enumerated factors reveals that the class action is superior to other forms of suit. Individual members have shown little interest in controlling the prosecution of this matter. Only six potential Class Members have requested exclusion from the Class, *see* Garr Aff. ¶ 7, and no Class Members have objected to certification of the class or the proposed settlement. Furthermore, while damage estimates collectively soar into the millions, each Class Member's individual damages are minimal. Minimal, individual damages often result in few Class Members bringing their own suit. *See*

*Eisenberg*, 766 F.2d at 785 (acknowledging that, in securities fraud cases, a class action is often the superior means of litigating claims because there may be many injured individuals who have not been damaged to a degree that would induce them to bring their own suits). Thus, the class action provides a vehicle through which more investors will assert their claims. In addition, the parties have not brought to the attention of the Court any ongoing litigation by Class Members. Finally, concentrating the litigation in this forum will avoid duplicative litigation, and thus save judicial resources. An analysis of the superiority factors militates in favor of certifying the class.

### C. *Fairness*

 As noted, federal law requires judicial approval of the settlement of a class action lawsuit. Under Fed.R.Civ.P. 23(e), the Court should approve a class settlement if it is "fair, adequate, and reasonable." *Eichenholtz v. Brennan*, 52 F.3d 478, 482 (3d Cir.1995) (internal citations omitted). The court has considerable discretion in determining whether a proposed settlement meets this standard. *See id.* at 482 (citing *Walsh v. Great Atl. & Pac. Tea Co., Inc.*, 726 F.2d 956, 965 (3d Cir.1983)). A district court must consider the following factors when evaluating the fairness and adequacy of a settlement:

> (1) the complexity, expense and likely duration of the litigation ...; (2) the reaction of the class to the settlement ...; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability ...; (5) the risks of establishing damages ...; (6) the risks of maintaining the class action through the trial ...; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery ...; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation[.]

*Girsh v. Jepson*, 521 F.2d 153, 156 (3d Cir. 1975) (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir.1974)).

#### 1. *Complexity, Expense and Duration of the Litigation*

"This factor is intended to capture the probable costs, in both time and money, of continued litigation." *In re Gen. Motors Corp.*, 55 F.3d at 811. Securities class actions are inherently complex, and this case is no exception, as the expense of continued litigation against AremisSoft would be substantial. *See In re Ikon*, 194 F.R.D. 166, 179.

First, if the parties had not settled, they would have had to engage in an extensive discovery process. At a minimum, this process would have involved; review and analysis of voluminous documents, many of which would have had to be translated into English; an extensive deposition program encompassing AremisSoft's senior management, the individual (non-settling) Defendants (some of whom reside in foreign countries, making service and process difficult), and a substantial number of non-parties; and the hiring, preparation, and deposing of numerous expert witnesses.

After this costly and lengthy discovery, it is likely that the parties would have engaged in extensive motion practice, consisting of, at a minimum, motions to dismiss and motions for summary judgment. These motions would have diminished the amount of any recovery by the Class, depleted the resources of a defendant with few remaining assets, and presented the Court with difficult legal and factual issues to resolve.

Finally, trial of the liability issues alone would have involved substantial attorney and expert time, the introduction of voluminous documentary and deposition evidence, vigorously contested motions, and the considerable expenditure of judicial resources. The "normal" costs of litigation, including copying, travel, depositions, computer support services, and other necessary expenses, would have been quite high. In a complex class action litigation such as this, those expenses would have imposed a significant burden on any recovery obtained for the Class if Plaintiffs were ultimately successful. A result that avoids an unnecessary and unwarranted expenditure of resources and time benefits all parties. *In re Gen. Motors*

*Corp.,* 55 F.3d at 812; *In re Computron Software, Inc., Sec. Litig.,* 6 F.Supp.2d 313, 317 (D.N.J.1998) (hereinafter *"In re Computron"*)

### 2. *Class Reaction to the Settlement*

"This factor attempts to gauge whether members of the class support the settlement." *In re Prudential,* 148 F.3d at 318. Courts construe class members failure to object to proposed settlement terms as evidence that the settlement is fair and reasonable. *See Fickinger v. C.I. Planning Corp.,* 646 F.Supp. 622, 631 (E.D.Pa.1986) ("[U]nanimous approval of the proposed settlement by the class members is entitled to nearly dispositive weight."). However, courts must be cautious about "inferring support from a small number of objectors to a sophisticated settlement." *In re Gen. Motors Corp.,* 55 F.3d at 812. This is particularly true in securities cases, as many shareholders may have such small stock holdings that it is imprudent to invest the time and resources to contest a settlement. *See id.; Bell Atl. Corp. v. Bolger,* 2 F.3d 1304, 1313 n. 15 (3d Cir.1993).

To date, (more than three weeks past the deadline for lodging objections), no Class Member has objected to the Settlement. The Court shall not attribute the lack of objections to a failure to notify, as more than 35,000 copies of the Notice were mailed to potential Class Members, and a summary notice of the proposed class action settlement and hearing were published in The Wall Street Journal and in the International Herald Tribune. Both Notices clearly inform potential Class Members of their right to object to the Settlement. Schiffrin Aff., ¶ 30. Absent any objection, and mindful of the thorough notice provided, the Court finds that the Settlement is favored.

### 3. *The Stage of Proceedings and Amount of Discovery Completed*

A settlement should not be approved if the parties do not have an " 'adequate appreciation' " of the merits of the case. *In re Prudential,* 148 F.3d at 319 (quoting *In re Gen. Motors Corp.,* 55 F.3d at 813). Consequently, the type and amount of discovery that has occurred since the commencement of the Action are relevant to the propriety of settlement. However, the fact that this case is in its early stages does not necessarily weigh against approval of the Settlement. In fact, settlements reached at earlier stages of proceedings are favored. *In re Computron,* 6 F.Supp.2d at 318.; *see also, Weiss v. Mercedes–Benz of North Am., Inc.,* 899 F.Supp. 1297, 1301 (D.N.J.1995) (settlement approved while the "case is still in the early stages of discovery"); *In re Novacare Sec. Litig.,* [1995–1996 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 98,930 at 93,500, 1995 WL 605533 (E.D.Pa. Oct. 13, 1995) ("[O]ne of the benefits of settlement at an early stage is avoidance of the expense of extended discovery that might well effect [sic] plaintiffs' proof at trial. When the parties reach an early settlement, it must be fair, adequate, and reasonable but not necessarily identical with the results that might be reached at trial.").

The parties reached this Settlement only after Plaintiffs' Counsel engaged in careful and extensive research, investigation, and analysis of the facts and circumstances regarding AremisSoft's conduct and the damages suffered by the Class. (Schiffrin Aff., ¶¶ 9, 21–24). Specifically, Plaintiffs' Counsel consulted with investment bankers, investigators, damages experts, and securities laws experts, reviewed thousands of pages of AremisSoft documents, and interviewed AremisSoft's current managerial team. (*Id.*). Based on such an analysis, Plaintiffs' Counsel have a sufficient basis upon which to assess the strengths and weaknesses of the claims and the Settlement.

### 4. *The Risks of Establishing Liability and Damages*

In evaluating the risks of establishing liability and damages, the court is to "survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of immediate settlement." *In re Prudential,* 148 F.3d at 319. However, the court should avoid conducting a "mini-trial and must, to a certain extent, give credence to the estimation

of the probability of success proffered by class counsel[.]" *In re Ikon*, 194 F.R.D. at 181 (citation omitted).

This case is no exception to the rule that securities litigation involves complex issues of fact and law. To succeed on their claims, the Class must establish that each Defendant was responsible for an omission or a misstatement that was material and that caused damage to the Class. *See TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In addition, with respect to its claims under Section 10(b) of the 1934 Act, the Class must also establish that Defendants acted with scienter. Regardless of the strength of case counsel might present at trial, victory in litigation is never guaranteed. A jury could place considerable weight upon the credibility and testimony of Defendants and other witnesses, some of whom are well respected businessmen, who would undoubtedly deny knowledge of a fraud. Such risks as to liability, among others, strongly weigh in favor of the Settlement.

In addition, the Class would have to overcome damage defenses that Defendants would assert. As is often the case, the parties would likely engage in a "battle of the experts," the outcome of which would be unpredictable. The Court recognizes the very real possibility that a jury could be swayed by Defendants' experts seeking to minimize Class Members' losses or to show that the losses were attributable to factors other than the alleged misstatements and omissions. *See Robbins v. Koger Properties, Inc.*, 129 F.3d 617 (11th Cir.1997) (finding no loss causation and overturning $81 million jury verdict). Settlement is favored because it eliminates these inherent, unavoidable litigation risks.

### 5. The Risks of Maintaining the Class Action Through Trial

"The value of a class action depends largely on the certification of the class because, not only does the aggregation of the claims enlarge the value of the suit, but often the combination of the individual cases also pools litigation resources and may facilitate proof on the merits. Thus, the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the action." *In re Gen. Motors Corp.*, 55 F.3d at 817; *see also In re Ikon*, 194 F.R.D. 166, 180–81. While decertification is always a possibility in any class action, the parties do not identify any particular issue or circumstance in this case that might lead to a particular risk of decertification. Consideration of this factor does not weigh in favor of or against the settlement. *See In re Ikon*, 194 F.R.D. at 183.

### 6. The Ability of the Defendants to Withstand a Greater Judgment

The Defendants' inability to withstand greater judgment militates in favor of settlement. *See In re Ikon*, 194 F.R.D. at 183 (noting that the Defendant's inability to pay more to plaintiffs favored settlement). Together with this motion to certify the Class and settle the litigation, the Defendant filed a motion to approve a Plan of Reorganization under Chapter 11. The bankruptcy and Plan is the vehicle that will allow AremisSoft to compensate the Class. Without the bankruptcy, Defendant would likely be forced to liquidate, and thus unable to compensate successful plaintiffs. Thus, Defendants' inability to withstand greater judgment evidences of the fairness the settlement.

### 7. The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and in Light of All the Attendant Risks

"In order to assess the reasonableness of a proposed settlement seeking monetary relief, 'the present value of the damages the plaintiffs would likely recover if successful, appropriately discounted for the risks of not prevailing, should be compared with the amount of the proposed settlement.'" *In re Prudential*, 148 F.3d at 322 (quoting *In re Gen. Motors Corp.*, 55 F.3d at 806); *see also In re Ikon*, 194 F.R.D. 166, 183–84 (same).

The Settlement is reasonable in light of the best possible recovery and attendant litigation risks. First, the Settlement likely represents the best possible recovery. Success-

ful prosecution of Plaintiffs' claims would have likely compelled Defendant to liquidate, a result yielding little or no compensation for the Class. Instead, Plaintiffs' Counsel and AremisSoft's counsel, together, have devised a settlement in which the Class Members become partial owners of a viable new business entity. In this way, the parties have ensured that the Class Members have at least an opportunity to recoup their initial investment.

Furthermore, even though the pecuniary gain the settlement affords the Class is somewhat speculative, the Settlement is fair in light of the attendant risks of litigation. Many securities cases have been lost at trial, on post-trial motion, or on appeal. *See e.g. Robbins v. Koger Properties, Inc.*, 129 F.3d 617 (11th Cir.1997) (overturning an $81 million jury verdict for the plaintiff class on loss causation grounds and dismissed the entire litigation). The legal and factual difficulties and uncertainties of this case, the inherent unpredictability and delay of a lengthy and complex trial, and the appellate process that would necessarily follow any victory for Plaintiffs make the Settlement both reasonable and appropriate.

### D. Allocation Plan

■ This Court must also approve the Plan of Allocation. The Settlement contains a proposed Plan of Allocation establishing the method by which the Settlement Securities [5] will be distributed to Class Members who submit acceptable Proofs of Claim. "Approval of a plan of allocation of a settlement fund in a class action is governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable, and adequate." *In re Computron*, 6 F.Supp.2d at 321 (citations omitted). A plan of allocation that reimburses class members based on the type and extent of their injuries is generally reasonable. *See id.; see also In re Ikon*, 194 F.R.D. 166, 183–84. The Plan of

Allocation submitted here satisfies the same standards of fairness, reasonableness, and adequacy applicable to the Settlement as a whole because it compensates the Class for the damages each member sustained, and as such, no Class Member has objected to it.

■ The Plan of Allocation is fair and reasonable, in part because it reimburses Class Members based on the type and extent of the damages they incurred. The Plan of Allocation reflects the allegation that the prices of AremisSoft securities were artificially inflated (by reason of the allegedly false and misleading statements made by Defendants during the Class Period). As set forth in the Complaint, trading in AremisSoft securities was halted on July 27, 2001. After trading resumed, the price of AremisSoft common stock fell precipitously to $1.00 per share, and averaged $0.79 per share for the first five trading days thereafter. The Plan of Allocation discounts the claimed losses of "after market purchasers" who sold before the close of trading on May 14, 2001, and those who purchased and sold AremisSoft shares between the close of trading on May 14, 2001 and the close of trading on July 27, 2001. This discount accounts for the potential "causation defense" concerning inflation on such sales.

The Claims Administrator shall determine each Authorized Claimant's *pro rata* share of the Settlement Securities based upon each Authorized Claimant's "Recognized Claim" as calculated in accordance with the formula set forth below.[6]

An Authorized Claimant's "Recognized Claim" will be calculated as follows:

(1) With respect to AremisSoft common stock *purchased on the Initial Public Offering on April 22, 1999 or pursuant to the Registration Statement thereafter*, the term "Recognized Claim" means one-hundred percent (100%) of the difference, if a loss, between the (x) amount paid for AremisSoft common stock on the Initial Pub-

---

**5.** "Settlement Securities" is defined as SoftBrands common stock and Net Trust Recoveries minus approved costs, fees, and expenses.

**6.** The "Recognized Claim formula" is not intended to be an estimate of the amount a Class

Member might have been able to recover after a trial; nor is it an estimate of the amount that will be paid to Authorized Claimants pursuant to the Settlement.

lic Offering and (y) either: I) *for shares sold between April 22, 1999 and July 27, 2001,* the sum for which said shares were sold at a loss (net of brokerage commissions and transaction charges), or ii) *for shares still held at the close of trading on July 27, 2001,* $1.00 per share.

(2) With respect to AremisSoft common stock *purchased during the period April 22, 1999 through the close of trading on May 14, 2001 and sold on or before May 14, 2001,* the term "Recognized Claim" means ten percent (10%) of the difference, if a loss, between (x) the amount paid for AremisSoft common stock during the Class Period (including brokerage commissions and transaction charges), and (y) the sum for which said shares were sold at a loss (net of brokerage commissions and transaction charges) on or before May 14, 2001.

(3) With respect to AremisSoft common stock *purchased during the period April 22, 1999 through the close of trading on May 14, 2001 and still held as of the close of trading on May 14, 2001,* the term "Recognized Claim" means one-hundred percent (100%) of the difference, if a loss, between (x) the amount paid for AremisSoft common stock during the Class Period (including brokerage commissions and transaction charges), and (y) either (I) the sum for which such sales were sold for a loss on or before July 27, 2001, or (ii) $0.79 per share for each share that was still held as of the close of trading on July 27, 2001.

(4) With respect to AremisSoft common stock *purchased after the close of trading on May 14, 2001 and sold prior to close of trading on July 27, 2001,* the term "Recognized Claim" means ten percent (10%) of the difference, if a loss, between (x) the amount paid for AremisSoft common stock during the Class Period (including brokerage commissions and transaction charges), and (y) the sum for which said shares were sold at a loss (net of brokerage commissions and transaction charges) on or before July 27, 2001.

(5) With respect to AremisSoft common stock *purchased after the close of trading on May 14, 2001 and still held after the close of trading on July 27, 2001,* the term

"Recognized Claim" means one-hundred percent (100%) of the difference, if a loss, between (x) the amount paid for AremisSoft common stock during the Class Period (including brokerage commissions and transaction charges), and (y) $0.79 per share for each share that was still held as of the close of trading on July 27, 2001.

Purchases during the Class Period will be matched against sales during the Class Period on a first-in, first-out basis. Transactions resulting in a gain shall not be included. Each Authorized Claimant will be allocated a *pro rata* share of the Net Settlement Securities based on his, her or its Recognized Claim as compared to the total Recognized Claims of all Authorized Claimants. Eligible Class Members who do not submit acceptable Proofs of Claim will not share in the Settlement Securities. Eligible Class Members who do not submit a request for exclusion or submit an acceptable Proof of Claim will nevertheless be bound by the Settlement, the assignment of claims, and the Order and Final Judgment of the Court dismissing this Action.

The favorable reaction of the Class supports approval of the proposed Plan of Allocation. No Class Member has objected to the Plan of Allocation, although more than 35,000 notices have been distributed. (Schiffrin Aff. ¶¶ 38–39.) Because the Plan of Allocation compensates Class Members according to injuries they incurred, and because no Class Member has objected to the Plan, the proposed Plan of Allocation is a fair, reasonable, and adequate method for allocating the Net Settlement Fund among the various members of the Class.

### E. Fee Application

As compensation for their efforts, Plaintiffs' Counsel seek a fee of: (a) one-third (33–1/3%) of the SoftBrands common stock distributed by, or on behalf of, AremisSoft to the Class; (b) twenty percent (20%) of any amounts recovered as a result of litigation or negotiated settlement from funds currently frozen in the Isle of Man; and ©) thirty percent (30%) of all other amounts recovered including, without limitation, amounts recovered from insurance carriers, professional

firms, investment banks, or other persons or entities as a result of litigation or negotiated settlements, whether inside or outside the United States. (Schiffrin Aff. ¶ 39.)

■■■■ Attorneys who represent a class and aid in the creation of a settlement fund are entitled to compensation for legal services offered to the settlement fund under the common fund doctrine. *In re Gen. Motors Corp.*, 55 F.3d at 820 n. 39. A district court must thoroughly analyze a fee application in a class action settlement. *See id.* at 819. This rule holds true even where the parties to the class action have consented to an award of attorneys' fees because of a "danger ... that the lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment for fees." *Id.* (quoting *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 524 (1st Cir.1991)). The possible self-interest of a defendant who is paying both the settlement amount and attorneys' fees often does not protect against this danger because " 'a defendant is interested only in disposing of the total claim asserted against it; ... the allocation between the class payment and the attorneys' fees is of little or no interest to the defense.' " *Id.* at 819–20 (quoting *Prandini v. National Tea Co.*, 557 F.2d 1015, 1020 (3d Cir.1977)); *Strong v. BellSouth Telecom., Inc.*, 137 F.3d 844, 849–50 (5th Cir.1998). Therefore, the Third Circuit has cautioned that a "district court must be alert to the presence in the fee agreement of any actual abuse or appearance of abuse capable of creating a public misunderstanding." *In re Gen. Motors Corp.*, 55 F.3d at 820.

"The amount of the award of attorneys' fees and expenses is controlled by the Court and is within its sound discretion." *In re Gen. Motors Corp.*, 55 F.3d at 783, 821 (citing *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 115 (3d Cir.1976)). Determining an appropriate award is not an exact science. *In re Computron.*, 6 F.Supp.2d at 321. The facts of each individual case drive the amount of any award. *Id.*

Case law establishes two methods for evaluating the reasonableness of a request for attorneys' fees—the lodestar approach and the percentage-of-recovery approach. *Id.* Each is especially suited for a particular type of case. *See In re Gen. Motors Corp.*, 55 F.3d at 821 (citation omitted). When deciding upon a fee award, a court must first categorize the type of action before it and then primarily rely upon the corresponding method for awarding fees. *See id.* Either the percentage-of-recovery method or the lodestar method should ordinarily serve as the primary basis for determining the fee award. However, the Circuit has instructed that a "court may ..., as a check, want to use the lodestar method to assure that the precise percentage awarded does not create an unreasonable hourly fee." *Id.* at 822.

The lodestar method, which multiplies the number of hours by an hourly rate appropriate for the region and lawyer's experience, is the proper method in statutory fee-shifting cases. *See In re Gen. Motors Corp.*, 55 F.3d at 821. Conversely, the percentage-of-recovery method is used in common fund cases on the theory that class members would be unjustly enriched if they did not adequately compensate counsel responsible for generating the fund. *See In re Gen. Motors Corp.*, 55 F.3d at 821 (citation omitted). Typically, a court should apportion the fund between the class and its counsel in a way "that rewards counsel for success and penalizes it for failure." *Id.* This method is similar to a contingency arrangement in that it awards counsel a variable percentage of the amount ultimately recovered for the class. *See id.* at 819 & n. 38. "Common fund" principles and the inherent management powers of the court have been utilized to award fees to lead counsel in cases that do not actually generate a common fund. *See In re Gen. Motors Corp.*, 55 F.3d at 821. While the Circuit has expressed a preference for the percentage-of-recovery method in common fund cases, *see id.* at 821–22, neither the Circuit nor the United States Supreme Court has mandated that courts use the percentage-of-recovery method exclusively. *See id.* at 821 ("The ultimate choice of methodology will rest within the district court's sound discretion.").

■■■ The Court shall rely on the percentage-of-recovery method in this case. First, this case is a common fund case (the fund

consisting of SoftBrands shares and cash), favoring use of the percentage-of-recover method. *See In re Ikon,* 194 F.R.D. at 194 (holding that because case was a "paradigmatic common fund case" it would apply the percentage method) (citing *In re Chambers Dev. Sec. Litig.,* 912 F.Supp. 852, 860 (W.D.Pa.1995)). Second, case law casts some doubt on the feasibility of the lodestar method in class action litigation such as this. *See id.* (noting that lodestar method has "come under attack" because it may encourage attorneys to delay settlement to maximize fees and places strain on the judicial system by mandating that the courts scrutinize the propriety of thousands of billable hours) (citing *In re Prudential,* 148 F.3d at 333). The fact that Plaintiffs' Counsel took this case on a contingent basis further supports application of the percentage-of-recovery method. *See id.*

### 1. Application of Percentage of Recovery Method

Under the percentage-of-recovery method, a court must (1) value the proposed settlement and (2) decide what percentage of the proposed settlement should be awarded as attorneys' fees. *In re Gen. Motors Corp.,* 55 F.3d at 822. The Circuit has observed that, in valuing a settlement offer, a district court must "determine a precise valuation of the settlement on which to base its award." *Id.* Despite the obvious rigor accompanying this process, the Circuit also observed that "[a]t the very least, the district court … needs to make some reasonable assessment of the settlement's value." *Id.; see also Weiss,* 899 F.Supp. at 1304.

A court also must specify the percentage it has utilized in determining the fee award. *See In re Gen. Motors Corp.,* 55 F.3d at 822 ("At the very least, the district court … needs to make some reasonable assessment of the settlement's value and determine the precise percentage represented by the attorneys' fee."). There is no set standard, however, for determining a reasonable percentage. Awards utilizing the percentage-of-recovery method can reasonably range from nineteen percent to forty-five percent of a settlement fund. *In re Computron,* 6 F.Supp.2d at 322.

In a common fund case, where the fees and the award stem from the same source and the fees are based on a percentage amount of the clients' settlement, a district court should consider several factors in setting a fee award. *See Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190, 195 n. 1 (3d Cir.2000) (setting forth factors to guide court in determining reasonableness of a percentage fee award); *see also In re Safety Components, Inc., Sec. Litig.,* 166 F.Supp.2d. 72, 93–94 (D.N.J.2001). Those factors include:

(1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the … fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

*Id.* (citing *In re Prudential,* 148 F.3d at 336–40 and *In re Gen. Motors Corp.,* 55 F.3d at 819–22). These factors "need not be applied in a formulaic way. Each case is different, and in certain cases, one factor may outweigh the rest." *Gunter,* 223 F.3d at 195 n. 1.

Before considering the *Gunter* factors, the Court must note the difficulties in determining the propriety of this Fee Application under Third Circuit precedent. Precedent dictates that a Court value the proposed settlement, *In re Gen. Motors Corp.,* 55 F.3d at 822, and evaluate the reasonableness of the attorney's fee request relative to the award given to the class, and to fees awarded in other, similar cases. *See e.g. In re Safety Components, Inc., Sec. Litig.,* 166 F.Supp.2d 72, 93–4 (D.N.J.2001). In other words, this analysis requires that the Court assign a dollar value to the settlement and attorneys' fees sought, and compare the two in dollar terms. *See id.* (holding that one-third fee request equaling $1.5 million is reasonable in light of $4.5 million settlement). However, this Fee Application does not fit

neatly into this paradigm because the fund is not susceptible to valuation.

First, Plaintiffs' Counsel does not seek attorney's fees in cash. Rather, the Fee Application requests thirty three and one-third percent (33–1/3%) of the SoftBrands common stock distributed to the Class, or approximately 8,000,000 SoftBrands shares.[7] Currently, no active market for SoftBrands shares exists, as the shares have not yet been issued. Without this market, precise valuation of the shares, and hence, of the fee award, is difficult, if not impossible.[8]

Second, Plaintiffs' Counsel seeks twenty percent (20%) of any amounts recovered as a result of litigation or negotiated settlement from funds currently frozen in the Isle of Man. Plaintiffs' Counsel estimates that the Defendants hid approximately $170 million in that jurisdiction, and the Trust will seek to repatriate that money for the benefit of the Class. However, the United States Government also claims entitlement to that money, seeking disgorgement in three actions.[9] Thus, although one knows the maximum possible recovery from the Isle of Man funds, the Government's competing claims render the Court unable to estimate, with any reasonable certainty, how much, if any, the Class and the attorneys will recover.

Finally, the Fee Application seeks thirty percent (30%) of all other amounts recovered as a result of litigation or negotiated settlements, whether inside or outside the United States. Again, unknown variables render evaluation of the these claims speculative. First, while one can often estimate the maximum award a plaintiff hopes to win, this case does not provide that luxury, as no one knows how much money was secreted by the absconding defendants. Furthermore, even if estimates of the total possible recovery were available, the Court could not estimate how much the Co Trustees and Plaintiffs' Counsel could successfully recover via future litigation. Predicting the outcome of any litigation is inherently difficult, and that difficulty is enhanced in this case because the absconding defendants scattered the illicit proceeds of their fraud throughout various countries, and likely sheltered these funds in complicated financial vehicles. Thus, not only must Plaintiffs' Counsel locate the funds, but they must also endure the vagaries of international law in recovering them.[10]

Thus, absent a present market for SoftBrands shares, and absent the ability to estimate either the maximum potential recovery or the likelihood of success in seeking such recoveries, the Court is unable to assign to the Fee Application a specific dollar value. This, in turn, makes it difficult to evaluate the propriety of the Fee Application under existing precedent, which generally considers attorneys' fees in terms of dollar amounts.

However, the Court will endeavor to value the Settlement and analyze the Fee Application by making some assumptions. For purposes of this analysis, the Court will assume that one share of SoftBrands stock has a value of one dollar ($1.00).[11] The Court will further assume that Plaintiffs' Counsel will succeed in recovering all $170,000,000 currently frozen in the Isle of Man. These dollar amounts are optimistic, but illustrative for purposes of this analysis.

Under these assumptions, the Class's total gross recovery equals approximately

---

7. According to the Plan, SoftBrands will issue 40,000,000 shares of stock. The Settlement requires that the Class receive sixty and one-half percent (60.5%) of all shares issued, all 24,200,-000 shares. The fee application seeks one third of that award, or approximately 8,000,000 shares.

8. The SoftBrands stock will be issued as part of the Plan of Reorganization. The Court assumes that the stock will be traded in an efficient market after it is issued.

9. The Government claims entitlement to the funds in the Isle of Man in three actions: *United States v. The Contents of Fleming of Isle of Man*

*Acct. Nos. 43016907 and 43016908*, Civ. Act. No. 02–2319 (S.D.N.Y.), *Securities and Exchange Comm., v. AremisSoft Corp., et. al.*, Civ. Act. No. 01–8903 (S.D.N.Y), and *United States v. Poyiadjis, et. al.*, Crim. No. 01–1177.

10. The Court further notes that the non-settling defendants will no doubt assert vigorous defenses, including the position that they, too, were victimized.

11. The assumed value can just as easily be expressed as "x". The percentage of Plaintiffs' Counsel's interest does not change.

$194,000,000.[12] In turn, under the Fee Application, Plaintiffs' Counsel would be awarded $42,000,000, and the Class's net recovery would equal $152,000,000.[13] Thus, under these assumptions, the Fee Application seeks approximately twenty-eight percent (28%) of the gross Class recovery. Even under these assumptions the Court finds the Fee Application to be reasonable.

### (1) Size of Fund and Number of Persons Benefitted

The first factor to be considered under the *Gunter* analysis is "the size of the fund created and the number of persons benefitted." *Gunter*, 223 F.3d at 195 n. 1. In general, as the size of the settlement fund increases, the percentage award decreases. *In re Prudential*, 148 F.3d at 339; *see also Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 148 (E.D.Pa.2000). The Third Circuit has explained that the "basis for this inverse relationship is the belief that '[i]n many instances the increase [in recovery]' is merely a factor of the size of the class and has no direct relationship to the efforts of counsel." *In re Prudential Ins.*, 148 F.3d at 339 (internal citations omitted).

Neither the size of the Class nor the proposed settlement is so large as to require this Court to decrease the award. First, the Class consists of less than 35,000 shareholders. Second, even when making the assumptions set out above, the total Settlement is worth approximately $194,000,000. This settlement is not so large as to necessitate a reduction in the fee award. *See In re Ikon*, 194 F.R.D. at 193 (noting that $108,000,000 settlement fund was not that large compared to $1 billion fund created in *In re Prudential*); *see also In re Safety Components Sec. Litig.*, 166 F.Supp.2d at 97. Furthermore, the size of this fund is due primarily to the number of shares SoftBrands will issue (40,-000,000), which was a matter of business

judgment made in during planning for the reorganization, and not the size of the Class. Thus, the Court is not concerned that Plaintiffs' Counsel's compensation is simply the result of a very large class.

### (2) Presence or Absence of Substantial Objections

The second *Gunter* factor is "the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel." *Gunter*, 223 F.3d at 195 n. 1. The absence of any objections mitigates against reducing such amounts. *See also In re General Motors*, 55 F.3d at 812 (quoting *Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1313 n. 15 (3d Cir.1993)) (stating that it is generally assumed that " 'silence constitutes tacit consent to the agreement' "); *Cullen*, 197 F.R.D. at 149 (a lack of objections supported approval of the fee request).

The reaction of the Class confirms the reasonableness of the requested fee. The Notice mailed to the Class specifically indicates that Plaintiffs' Counsel would apply for a fee award of one third of the approximate settlement amount and that any Class Member could object to the fee application. The deadline for filing an objection was June 3, 2002, and, thus far, only one member of the Class has objected to Plaintiffs' Counsels' request for an award of attorney's fees or reimbursement of expenses. (*See* Schiffrin Aff. ¶ 41.) However, that objection came in the from of a letter mailed directly to chambers, rather than a formal motion. Furthermore, the letter was received well after the deadline for filing objections to the Fee Application, and failed to state any reason whatsoever for the objection. The fact that only one Class Member made a vague and conclusory objection, well after the deadline to do so, strongly evidences that the Fee Application is fair and reasonable. *See SmithKline*

---

**12.** This figure represents $170,000,000 recovered from the Isle of Man plus the $24,200,000 worth of SoftBrands shares the Class receives pursuant to the Settlement.

**13.** The Fee Application seeks thirty three and one third percent of the shares distributed to the Class, and twenty percent of all money recovered from the Isle of Man funds. One third of the

$24,200,000 in shares the Class will receive is approximately $8,000,000. Twenty percent of the total amount recovered from the Isle of Man equals approximately $34,000,000. Thus, the Fee Application seeks a total of $42,000,000. To arrive at the net Class recovery of $152,000,000, the Court simply subtracted $42,000,000 from the gross Class recovery of $194,000,000.

*Beckman,* 751 F.Supp. 525, 533 (E.D.Pa. 1990) (noting that absence of objections from class is evidence of propriety of the attorneys's fees request).

### (3) Skill and Efficiency of Attorneys Involved

The third factor delineated in *Gunter* is "the skill and efficiency of the attorneys involved." *Gunter,* 223 F.3d at 195 n. 1. The Circuit has explained that the goal of the percentage fee-award device is to ensure "that competent counsel continue to undertake risky, complex, and novel litigation." *Id.* at 198. The *Cullen* court explained that "[t]he single clearest factor reflecting the quality of class counsels' services to the class are the results obtained." *Cullen,* 197 F.R.D. at 149

The experience and expertise of Plaintiffs' Counsel establishes the fairness and reasonableness of the attorneys' fees requested. The affidavits and firm biographies submitted by all counsel list educational backgrounds, significant achievements, and a number of specific cases in which the firms obtained satisfactory outcomes for their clients. (*See, e.g.,* Schiffrin Aff., Exs. E through J.) Review of these materials indicates that the firms possess substantial experience litigating securities class actions. *Id.* For example, Milberg Weiss represented that it successfully prosecuted thousands of class action lawsuits, taken the lead role in numerous complex litigations, has been responsible for more than $30 billion in recoveries, and has received numerous judicial commendations for their work. *Id.* Furthermore, all counsel conducted themselves in a professional and expert manner throughout the case. They deftly handled the numerous and complex bankruptcy and reorganizational issues this matter posed.

Finally, the excellent result evidences Plaintiffs' Counsel's skill and efficiency. *See In re Safety Components Sec. Litig.,* 166 F.Supp.2d at 97 (considering "excellent result achieved" under skill and expertise factor of analysis). Litigation of the Class's claims would have likely driven AremisSoft into liquidation. In turn, liquidation would have decimated a possibly viable business model and left the class uncompensated. Rather

than slavishly pursuing such mediocre results, Plaintiffs' Counsel devised the creative settlement involved here. This Settlement confers the dual benefits of compensating the class for the injuries they endured while creating a new, and hopefully profitable business entity. In other words, rather than permitting litigation to destroy a business and shortchange investors, as securities class actions so often do, Plaintiffs' Counsel created a settlement that promotes a just result and furthers economic activity. This settlement plan and its beneficial results entitles Plaintiffs' Counsel to the fees requested.

### (4) Complexity and Duration of Litigation

The fourth *Gunter* factor relevant to the approval of an attorneys' fees award is "the complexity and duration of the litigation." *Gunter,* 223 F.3d at 195 n. 1. As discussed above, the complexity of this case weighs in favor of the approval of the Fee Application. First, Plaintiffs' Counsel would have faced several obstacles in establishing liability. *See, e.g., In re Safety Components Sec. Litig.,* 166 F.Supp.2d at 97 (considering difficulties counsel would have faced in litigation under complexity analysis). Plaintiffs' Counsel would likely have had to defeat motions to dismiss and summary judgment motions. Furthermore, litigation may have forced AremisSoft to liquidate, and thus, further diminished the potential for class recovery. Moreover, the bankruptcy petition, the transfer of AremisSoft's assets to SoftBrands, and the Litigation Trust designed to compensate the class significantly increase the complexity of this matter. This complexity weighs in favor of approval.

The brevity of this litigation, however, does not as strongly support approval. Early resolution of a case can be a double-edged sword in attorneys' fees applications. *See In re Safety Components Sec. Litig.,* 166 F.Supp.2d at 97 For example, in *In re Cendant PRIDES Litigation,* the Circuit found that the case was not pending long enough to warrant a $19,329,463 fee award. *In re Cendant PRIDES Litig.,* 243 F.3d 722, 734–5 (3d Cir.2001). The Court based this determination, *inter alia,* on the grounds that (1) the case was settled at a very early stage of the

litigation, (2) minimal motion practice had taken place, (3) discovery was virtually non-existent—no depositions were taken and no document review was conducted, and (4) counsel spent a relatively little time on the case as compared to most other large class actions. *Id.*

Similarly, this case settled early, before any formal discovery took place. However, while this case was pending, Plaintiffs' Counsel engaged in informal discovery and fact finding. (Schiffrin Aff., ¶¶ 23–25.) This informal discovery consisted of consultation with investment bankers, investigators, damages experts, securities laws experts, review of voluminous AremisSoft documents, and interviews of AremisSoft's current managerial team. *Id.* Furthermore, this factual discovery allowed the parties to achieve settlement at an early stage, avoiding considerable litigation expenses. Informal discovery leading to an early settlement that avoids such costs favors approval of the fee application. *See In re Safety Components Sec. Litig.*, 166 F.Supp.2d at 97

### (5) Risk of Nonpayment

The fifth factor for consideration under *Gunter* is "the risk of nonpayment." *Gunter*, 223 F.3d at 195 n. 1. In *Gunter*, the Circuit found that a high risk of nonpayment because "the defendants were close to insolvency." *Id.* at 199. Likewise, in *Cullen*, the district court found the risk of nonpayment to be "acute" because the defendant lacked "significant unencumbered hard assets against which plaintiffs could levy had a judgment been obtained." *Cullen*, 197 F.R.D. at 150.

The high risk of non-payment in this case favors approval of the Fee Application. The prospect of litigating the Class claims drove AremisSoft into bankruptcy. Lacking assets even in bankruptcy, AremisSoft is unable to compensate the Class or Plaintiffs' Counsel with cash. Rather, the award and fees will be in form of stock in the new business, SoftBrands. Risk of non-payment is particularly high in this case because, even once stock is issued, Plaintiffs' Counsel's holdings could become worthless. Thus, this factor weighs in favor of the Fee Application.

### (6) Amount of Time Devoted to Case by Plaintiffs' Counsel

The sixth *Gunter* factor is "the amount of time devoted to the case by Plaintiffs' Counsel." *Gunter*, 223 F.3d at 195 n. 1. Plaintiffs' Counsel devoted approximately 4870 hours to pursuing this litigation. (Schiffrin Aff. Exs. D, E.) The Schiffrin law firm logged the bulk of those hours. This factor does not weigh for or against the Fee Application.

### (7) Awards in Similar Cases

The Court must also consider "awards in similar cases." *Gunter*, 223 F.3d at 195 n. 1. The Circuit has noted that while percentages awarded have varied considerably, most fee awards range "from nineteen percent to forty-five percent of the settlement fund." *In re Cendant PRIDES Litig.*, 243 F.3d at 736; *Smith v. First Union Mortgage Corp.*, No. 98–5360, 1999 WL 509967, at *4 (E.D.Pa. July 19, 1999); *In re Computron*, 6 F.Supp.2d at 322. While "[t]he median in class actions is approximately twenty-five percent, . . . awards of thirty percent are not uncommon in securities class actions." *In re Ikon*, 194 F.R.D. at 194 (citing *Ratner v. Bennett*, No. 92–4701, 1996 WL 243645, at *8 (E.D.Pa. May 8, 1996)). However, "a district court may not rely on a formulaic application of the appropriate range in awarding fees but must consider the relevant circumstances of the particular case." *In re Cendant PRIDES Litig.*, 243 F.3d at 736; *In re Safety Components Sec. Litig.*, 166 F.Supp.2d at 101.

As compensation for their efforts, Plaintiffs' Counsel seek a fee of: (a) one-third (33 1/3%) of the SoftBrands common stock distributed by, or on behalf of, AremisSoft to the Class; (b) twenty percent (20%) of any amounts recovered as a result of litigation or negotiated settlement from funds currently frozen in the Isle of Man; and ©) thirty percent (30%) of all other amounts recovered as a result of litigation or negotiated settlements whether inside or outside the United States. (Schiffrin Aff., ¶ 39). Again, even when the Court assumes SoftBrands shares to have a value of a dollar per share, and Plaintiffs' Counsel's success in recovering all $170,000,000 from the Isle of Man, the fees

total 27% of the Class recovery. Scores of cases exist where fees were awarded in the one-third to one-half of the settlement fund. *See, e.g., In re Fidelity Med. Inc., Sec. Litig.*, Master File No. 92–1908(MTB) (D.N.J. Oct. 4, 1994) (awarding class counsel fees of 331/3% of settlement fund) (Schiffrin Aff., Ex. J); *Ward v. Wellman*, Civ. Act. No. 90–376(JCL) (D.N.J. June 22, 1992) (33 1/3% plus expenses) (Schiffrin Aff., Ex. K); *In re SmithKline Beckman Corp. Sec. Litig.*, 751 F.Supp. 525, 533 (E.D.Pa.1990) (recognizing that courts have awarded attorneys' fees of up to "45% of the settlement fund created"). Obviously, this fee application falls well within the acceptable range.

The Court notes that, under the current fee request, the attorneys could reap a huge windfall were SoftBrands stock to appreciate in value. However, this possibility does not diminish the reasonableness of the fee application, due to the fact that counsel shouldered, and continues to shoulder, significant risk in litigating this case. Courts have recognized that the risk of non-payment in complex cases, such as this, is very real and is heightened when Plaintiffs' Counsel press to achieve the very best result for their clients. *See Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 199 (3d Cir.2000) ("the risk that counsel takes in prosecuting a client's case should also be considered when assessing a fee award"). Here, Plaintiffs' Counsel took this case on a contingent basis. Additionally, Plaintiffs' Counsel continue to shoulder risk of nonpayment, as counsel is only entitled to 20% of funds recovered from the Isle of Man, and 30% of future awards or settlements, *if any*. Finally, Plaintiff's Counsel will not be remunerated in cash, but rather in shares of the newly formed business entity. The inherently speculative nature of the Plaintiffs' Counsel's compensation further enhances their risk. Thus, this Fee Application is well within acceptable range of attorneys' fees for similar cases.

### 2. Application of Lodestar Recovery Method

A court may check its percentage recovery determination against a lodestar method calculation to assure that the precise percentage awarded is not an unreasonable hourly fee. *In re Gen. Motors Corp.*, 55 F.3d at 822; *In re Safety Components, Inc., Sec. Litig.*, 166 F.Supp.2d. 72, 102 (D.N.J.2001). A court determines "an attorneys' lodestar award by multiplying the number of hours he or she reasonably worked on a client's case by a reasonable hourly billing rate for such services given the geographical area, the nature of the services provided, and the experience of the lawyer." *Gunter*, 223 F.3d at 195 n. 1. To examine the lodestar factor effectively, "a Court should make explicit findings about how much time counsel reasonably devoted to a given matter, and what a reasonable hourly rate would be for such services." *Id.* at 199–200. A court may then multiply the lodestar calculation to reflect "the risks of nonrecovery, to reward an extraordinary result, or to encourage counsel to undertake socially useful litigation." *In re Safety Components, Inc. Sec. Litig.*, 166 F.Supp.2d at 102 (citations omitted); *see also In re Prudential*, 148 F.3d at 340–41.

As noted above, the Court cannot engage in the typical cross-check using the lodestar method. Plaintiffs' Counsel will be compensated in SoftBrands stock, the value of which is currently uncertain, making it difficult to compare the percentage-of-recovery award to the lodestar calculation. However, even assuming a value of one dollar per SoftBrands share, application of the lodestar method renders the Fee Application reasonable.[14]

Plaintiffs' Counsel submits that its lodestar, to date, is $1,855,608. (Schiffrin Aff. ¶ 43). They base this calculation on 4870 hours expended in pursuit of this litigation. Assuming Plaintiffs' Counsel is awarded $8,000,000, or one third the assumed value of the SoftBrands shares awarded to the Class, that represents a lodestar multiplier of 4.3.

Review of the submissions of counsel demonstrate that the amount of time expended appears reasonable. For example, no partner at the firm of Schiffrin & Barroway LLP,

---

**14.** The Court does not include in this calculation possible recoveries from the Isle of Man funds. Recovery of that money will require substantial future efforts, and thus, hours logged to date do not represent those efforts.

logged over one thousand hours. (Schiffrin Aff. at Ex. D). Similarly, Milberg Weiss had only one attorney bill more than 200 hours to this case. (Schiffrin Aff. at Ex. E). Furthermore, Schiffrin & Barroway LLP make up 3047.5 of the 4870 hours billed to the entire matter. (Schiffrin Aff. at. Ex. D). Thus, unnecessary duplication by other firms is not an issue. Therefore, the lodestar calculation need not have to be reduced. *See In re Safety Components, Inc. Sec. Litig.*, 166 F.Supp.2d at 103 (holding that lodestar did not have to be reduced because hours expended appeared reasonable and there was not duplication of effort). Furthermore, the firms billed these hours at reasonable rates, given their expertise and the market. For example, hourly rates for the attorneys at the firm of Schiffrin & Barroway ranged from $525/hour for Mr. Schiffrin, to $305/hour for an associate. (Schiffrin Aff. at Ex. D.) Similarly, hourly rates for attorneys at the law firm Milberg Weiss Bershard Hynes & Lerach, LLP ranged from $635/hour for Mr. Weiss, who billed only 12.25 hours, to $245/hour for a firm associate. (Schiffrin Aff. at Ex. E.) These rates are reasonable in light of the relevant market and the expertise of the attorneys, discussed extensively *supra.*

Even assuming a value of one dollar per share, the 4.3 lodestar multiplier would be proper in this case. First, this lodestar is close to the range deemed acceptable by the Court of Appeals. *See In re Prudential,* 148 F.3d at 341 (noting that "multiples ranging from one to four are frequently awarded in common fund cases . . ."); *see In re Cendant PRIDES Litig.,* 243 F.3d at 742 (surveying cases to determine that lodestar multipliers generally range from 1.35 to 2.99). Furthermore, the high risk of non-payment in this case justifies the lodestar multiplier. As discussed above, Plaintiffs' Counsel took this case on a contingent basis, pursued litigation of a bankrupt company, and receive compensation in the form shares which currently have not value. Second, the excellent result achieved in this case justifies the assumed lodestar multiplier. Counsel crafted an innovative settlement that provides compensation for the Class while allowing the Defendant to continue to pursue profitable business activities.

### F. Reimbursement of Expenses

■ Plaintiffs' Counsel seek reimbursement of $242,143.69 for expenses incurred in the prosecution of this matter. (Schiffrin Aff. ¶ 46.) Counsel for a class action is entitled to reimbursement for expenses adequately documented and reasonably and appropriately incurred in the prosecution of the class action. *Abrams v. Lightolier, Inc.,* 50 F.3d 1204, 1225 (3d Cir.1995); *Cullen,* 197 F.R.D. at 151 (finding requested fees to be adequately documented, proper and reasonable).

■ Plaintiffs' Counsel seek reimbursement for costs incurred in paying experts and consultants, for investigative services, and for photocopying and other incidental expenses directly related to this matter. The submissions indicate that the expenses are adequately documented, reasonable, and appropriate for the litigation of this matter. Several courts have held that photocopying expenses, telephone and facsimile charges, postage, and messenger and express mail service charges are reasonably incurred in connection with the prosecution of a large litigation. *Abrams,* 50 F.3d at 1225: *Cullen,* 197 F.R.D. at 151. Likewise, witness fees and costs associated with expert witnesses and consultants are often deemed incidental to litigation. *Cullen,* 197 F.R.D. at 151; *In re Safety Components, Inc. Sec. Litig.,* 166 F.Supp.2d at 108. None of the amounts claimed appear excessive. Moreover, no Class Member has objected the proposed reimbursement of expenses. Accordingly, Plaintiffs' Counsel's request for reimbursement of expenses is approved.

### V. CONCLUSION

For the reasons set forth above, the Court grants the motion to certify the Class and approve the Settlement. Furthermore, the Court grants the motion to approve the Fee Application. An appropriate order follows.