966 A.2d 508 (2009)
406 N.J. Super. 86
John Ivan SUTTER, M.D., P.A., on behalf of himself and all others similarly situated, Plaintiff-Respondent/Cross-Appellant, and
Mario Criscito, M.D., Barry Prystowsky, M.D., Niranjan V. Rao, M.D., Robert Oberhand, M.D., Alexander Dlugi, M.D., Plaintiffs/Objectors-Appellants/Cross-Respondents,
v.
HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, Defendant-Respondent.
Union County Medical Society, Mercer County Medical Society, New Jersey Pediatric Society, New Jersey Association of Osteopathic Physicians and Surgeons, American College of Emergency Physicians, Vascular Society of New Jersey, New Jersey Pathology Society, Radiological Society of New Jersey, New Jersey Academy of Ophthalmology, New Jersey State Society of Anesthesiologists, Orthopaedic Surgeons of New Jersey, and New Jersey Chapter of the American College of Cardiology, Appellants/Cross-Respondents.
No. A-3708-06T3
Superior Court of New Jersey, Appellate Division.
Argued January 13, 2009.
Decided March 25, 2009.
*512 Steven I. Kern, Bridgewater, argued the cause for appellants/cross-respondents Union County Medical Society, Mercer County Medical Society, New Jersey Pediatric Society, Mario Criscito, M.D. and Barry Prystowsky, M.D (Kern Augustine Conroy & Schoppmann, attorneys; Mr. Kern, on the joint brief).
Wolf Block Schorr & Solis-Cohen, attorneys for appellants/cross-respondents New Jersey Association of Osteopathic Physicians and Surgeons, American College of Emergency Physicians, Vascular Society of New Jersey, New Jersey Pathology Society, Radiological Society of New Jersey, New Jersey Academy of Ophthalmology, New Jersey State Society of Anesthesiologists, Orthopaedic Surgeons of New Jersey and New Jersey Chapter of the American College of Cardiology (Charles X. Gormally, on the joint brief).
Chasan, Leyner & Lamparello, Secaucus, attorneys for appellants/cross-respondents Niranjan V. Rao, M.D., Robert Oberhand, M.D. and Alexander Dlugi, M.D. (Steven Menaker, on the joint brief).
Eric D. Katz argued the cause for respondent/cross-appellant John Ivan Sutter (Mazie Slater Katz & Freeman, attorneys; Mr. Katz and David Mazie, of counsel; Mr. Katz, Mr. Mazie and Matthew R. Mendelsohn, on the brief).
John M. Murdock of the VA and Washington, DC bar, admitted pro hac vice, argued the cause for respondent Horizon Blue Cross Blue Shield (Epstein Becker & Green, attorneys; Mr. Murdock and Maxine H. Neuhauser, of counsel and on the brief).
*513 Before Judges WEFING, PARKER and LeWINN.
The opinion of the court was delivered by PARKER, J.A.D.
In this appeal, we address the settlement of a class action that was instituted by New Jersey physicians against Horizon Blue Cross Blue Shield of New Jersey (Horizon). Appellants[1] are members of the class who objected to the settlement and the medical societies who sought to intervene, arguing that the settlement is illusory because it requires nothing more of Horizon than is required under the law and under its contracts. Appellants further argue that the attorneys' fees awarded to class counsel were grossly excessive. The medical societies argue that the trial court erred in denying their motion to intervene.
Plaintiff John Ivan Sutter, M.D., is the representative physician of the class of physicians. Plaintiffs argue in their cross-appeal that the appeal should be dismissed because all of the objectors are hostile to the interests of the class and some of the medical society appellants never moved to intervene in the trial court.
After considering the parties' arguments and the voluminous record on appeal in light of the applicable law, we are remanding the matter for a testimonial hearing and more adequate fact finding by the trial court as to the reasonableness of the settlement and for reconsideration of the attorneys' fees awarded.

I
The facts relevant to this appeal are as follows. The complaint alleged that physicians who rendered medical services to patient-members of Horizon's health care plans were harmed by Horizon's "repeated improper, unfair and deceptive acts and practices . . . which [were] designed to delay, deny, impede and reduce compensation to [plaintiffs]." Plaintiffs first claimed that Horizon failed to make prompt payments of claims and that Horizon engaged in "bundling," that is, it refused to provide compensation for a particular medical procedure by improperly including it in another procedure performed on the same date of service. Plaintiffs further alleged that Horizon engaged in "downcoding" of claims, which meant that it unilaterally and retroactively reduced the amount of compensation paid for medical services by changing the procedure codes to a procedure of lesser complexity. Finally, plaintiffs alleged that Horizon refused to recognize "modifiers" in cases in which additional medical services were required to treat more complex conditions or separate and unrelated conditions.
In certifying the class, the trial court permitted two sub-classes for all New Jersey physicians: a "prompt payment" class and a "capitation" class. A separate class of pediatricians was certified for claims of "downcoding," "bundling" and "refusal to recognize modifiers."
In June 2005, the trial court severed the claims of the prompt payment sub-class for trial. On the eve of trial, the parties agreed to a settlement. On October 24, 2006, the court signed a preliminary order of approval. Plaintiffs sent notice of the proposed settlement to the class members. Six members of the class, plaintiffs/objectors-appellants/cross-respondents Mario *514 Criscito, Barry Prystowsky, Niranjan V. Rao, Robert Oberhand, Alexander Dlugi and Myrna Tagayun[2] opposed the settlement.
The medical societies of Union and Mercer Counties and the New Jersey Pediatric Society moved to intervene to object to the settlement. The intervention motion was denied in an order entered on December 15, 2006.
On December 20, 2006, the court conducted a fairness hearing pursuant to Rule 4:32-2(e) on the prompt payment settlement proposal and allowed all of the objectors to argue, even those who were not accorded intervenor status. No testimony was taken, however. On February 2, 2007, the court rendered a written decision and entered an order approving the settlement and class counsel's fees and costs in the amount of $6.5 million.
Appellants moved for a stay of the fee award, which class counsel had opposed. The stay was apparently denied, but no order memorializing that ruling has been provided to us.

II
Appellants are critical of the following sections in the proposed settlement. Section 7.1 concerns "Disclosure of Significant Edits." An "edit" is an "adjustment" of the CPT codes or HCPCS Level II Codes, which were developed by the American Medical Association and used by all doctors to describe certain medical and surgical procedures. A "significant edit" was one that Horizon believed, based on its experience, would cause the denial of or reduction in payment for a particular CPT code or HCPCS Level II code. Under the settlement, once a year on its website, Horizon agreed to list every CPT and HCPCS Level II code combination that resulted in a significant reduction or a denial of payment, if such code edits occurred more than 250 times per year.
Section 7.2 obligates Horizon to give ninety days written notice if it intends to make material adverse changes to the terms of the contract, and allows a physician to terminate his or her contract upon objection to the proposed change.
Section 7.4 establishes a "Capitation Liaison," who would be responsible for resolving capitation inquiries and capitation payment issues. "Capitation" is the payment of a per-member-per-month amount by Horizon to the physician, "by which Horizon transfers to the provider the financial risk for those Covered Services as set forth in the contract between Horizon and the provider."
Section 7.5 permits participating physicians to close their practices to all new Horizon patients.
Section 7.6 obligates Horizon to provide complete fee schedules "typically" used in the participating physician's group, pursuant to their agreement with Horizon, upon the physician's request. Twice a year, the physicians can request the fee-for-service amounts of up to fifty other CPT codes or HCPCS Level II codes that the physician actually billed or anticipates billing.
In Section 7.8, Horizon agrees not to initiate overpayment recovery procedures more than eighteen months after payment is received by a physician.
Section 7.9 precludes Horizon from revoking a "medical necessity" determination once it has been pre-certified.
Section 7.10 precludes Horizon from using "Most Favored Nations" clauses, that is, provisions requiring that Horizon receive *515 the most advantageous contract terms and conditions, including reimbursement rates, that a participating physician agrees to with any other third party.
Section 7.11(b) precludes Horizon from imposing a "Pharmacy Risk Pool," whereby amounts payable to participating physicians could be reduced if plan members used certain pharmacies.
In Section 7.15, the parties estimated the approximate aggregate value of the settlement at $39 million allocated as follows: $30.61 million for disclosure of significant edits, $3.49 million for capitation reporting and dedicated liaison, and $4.13 million for limitations on over-payment recovery for insured lines of business. This provision was based upon a report dated October 9, 2006 by Teresa M. Waters, Ph.D., plaintiffs' economic expert. Waters submitted six reports over the course of the litigation. The first report claimed damages in the amount of $490,502,695. In the October 9, 2006 report, however, she reduced that figure to $39 million, stating:
Because the provisions cannot state with certainty how each and every eventuality will be handled and there is a general lack of data concerning the actual impact of the proposed provisions, my valuation must be based on the best information available at the time of this report and should be interpreted as a reasonable projection, rather than a statistical calculation.

[Emphasis added.]
Horizon presented reports by Steven N. Wiggins, Ph.D., criticizing Waters' methodology. Prior to the scheduled trial, Horizon moved to exclude Waters' expert testimony, arguing that she had no factual basis for her presumptions and that her methodology was flawed. The trial court determined that a hearing pursuant to N.J.R.E. 104 "was necessary to determine whether there were adequate factual and scientific bases as well as sufficient reliability to allow the computer analysis and opinions of Dr. Waters to be presented to the jury." Since the matter was settled without having the Rule 104 hearing, appellants never had the opportunity to cross-examine Waters.
The proposed settlement also addresses attorneys' fees, and states that class counsel may apply for an award of attorneys' fees in an amount set by the court, but the application may not exceed $6.5 million. In Section 8.3 of the proposal, Horizon agreed not to oppose class counsel's application and to pay $6.5 million in attorneys' fees. Section 8.2 of the agreement provided a stipend of $15,000 for Sutter as the representative plaintiff. No payments were to be made to any other class members.
Section 9 of the proposal sets forth time frames to implement the changes agreed to in Section 7. Horizon agrees to make reports to class counsel each year and for the court to maintain continuing jurisdiction over settlement issues.
In exchange for Horizon's reforms, plaintiffs agree in Sections 10 and 11 of the proposal to release certain claims for services that were submitted to Horizon prior to the effective date of the agreement. The agreement specifically states that physicians participating in the New Jersey settlement were not prohibited from obtaining any benefits that they may be entitled to as class members in similar actions in the United States District Court for the South District of Florida, Miami Division, captioned Love v. Blue Cross Blue Shield Association, CV-03021296.

III
In this appeal, appellants argue:
POINT ONE

*516 THE PROPOSED SETTLEMENT IS FUNDAMENTALLY UNFAIR, AND PROVIDES NO BENEFITS TO THE CLASS MEMBERS
A. The Proposed Settlement is Illusory
1) Disclosure of significant Edits, thirty million six-hundred ten thousand ($30,610,000) dollars
2) Capitation Reporting and Dedicated Liaisonthree million, four hundred ninety thousand ($3.49 million) dollars
3) Limitation on overpayment for insured lines of businessfour million one-hundred thirty thousand ($4.13 million) dollars
B. The Proposed Settlement Fails the Girsh [v. Jepson, 521 F.2d 153 (3d Cir. 1975) ] Analysis
1) Complexity and Duration of the Litigation
2) The Reaction of the Class to the Settlement
3) The Stage of the Proceedings
4) The Risks of Establishing Liability
5) The Risks of Establishing Damages
6) The Risks of Maintaining a Class Action
7) The Ability of the Defendant to Withstand a Greater Judgment
8) The Range of Reasonableness of the Settlement in Light of the Best Recovery
9) The Range of Reasonableness of the Settlement in Light of All the Attendant Risks of Litigation
C. The Proposed Settlement is Not Entitled to a Presumption of Fairness
D. The Lower Court Erroneously Precluded the Objectors from Taking Discovery Calling Critical Witnesses to Prove the Illusory Nature of the Proposed Settlement
POINT TWO
THE ATTORNEYS' FEES SOUGHT BY CLASS COUNSEL ARE GROSSLY EXCESSIVE, AND SHOULD BE DRASTICALLY REDUCED, OR DENIED
POINT THREE
CLASS COUNSEL'S LAW FIRM REGULARLY REPRESENTS INTERESTS ADVERSE TO NEW JERSEY'S PHYSICIANS, HAS AN INHERENT CONFLICT OF INTEREST AND IS NOT REPRESENTING THE BEST INTERESTS OF THE CLASS WITH RESPECT TO THE PROPOSED SETTLEMENT
POINT FOUR
THE TRIAL COURT ERRED IN DENYING THE SOCIETIES' MOTIONS TO INTERVENE
A. The Standard for Intervention
1) Extending Time to Opt Out
2) Communicating With the Members of the Societies to Convey Recommendation to Opt Out
3) Obtaining Copies of Depositions and Other Discovery
4) That Plaintiff be Required to Send an Amended, Accurate Notice of the Proposed Settlement to the Class Members
B. The Need for Intervention
C. The Need for Discovery

IV
At the December 20, 2006 fairness hearing, the objectors sought to cross-examine Waters on the methodology she used and the assumptions she made in valuing the settlement. The objectors allege that Waters' assumptions were "completely erroneous, and unworthy of any judicial consideration." They contend that Waters based her report "upon a statistically insignificant and unscientific sample" and that she assumed "the class included *517 sixty-thousand physicians, rather than less than 18,000."
Although the trial court acknowledged that a hearing was required under N.J.R.E. 104 "to determine whether there were adequate factual and scientific bases as well as sufficient reliability to allow the computer analysis and opinions of Dr. Waters to be presented to the jury," the court declined to allow appellants to cross-examine Waters on precisely those issues.
The objectors also sought to call as witnesses representatives of Horizon to testify "that the actual changes which would purportedly be made as a result of the proposed settlement, have, in large part already been made, or would have to be made under existing law." The objectors maintained that the Horizon witnesses "would have confirmed that no significant differences in Horizon's business practices will result from the proposed settlement and, therefore, that the settlement would have no real impact upon the medical community."
Moreover, appellants argue that they were entitled to discovery in order to test the strengths and weaknesses of the settlement proposal. They maintain that the court's refusal to allow discovery and cross-examination of witnesses was "manifestly unfair" and placed "the burden of proving the unfairness of the proposed settlement upon the objectors." At the time of the fairness hearing in December 2006, the trial court indicated that it would determine whether it wanted any further testimony. Obviously, it did not because the opinion was subsequently rendered without taking testimony.
Objectors are "entitled to an opportunity to develop a record in support of [their] contentions by means of cross-examination and argument to the court." Greenfield v. Villager Indus., Inc., 483 F.2d 824, 833 (3d Cir.1973). Objectors do not have an absolute right to discovery, however. In re Cmty. Bank of N. Va., 418 F.3d 277, 316 (3d Cir.2005). "[D]iscovery may be appropriate if lead counsel has not conducted adequate discovery or if the discovery conducted by lead counsel is not made available to objectors." Ibid. The court has the discretion to "`employ the procedures that it perceives will best permit it to evaluate the fairness of the settlement.'" Ibid. (quoting In re Prudential Ins. Co. of Am. Sales Practices Litg., 962 F.Supp. 450, 563 (D.N.J.1997), aff'd, 148 F.3d 283 (3d Cir.1998), cert. denied, 525 U.S. 1114, 119 S.Ct. 890, 142 L.Ed.2d 789 (1999)).
In Builders League of S. Jersey, Inc. v. Gloucester County Utils. Auth., 386 N.J.Super. 462, 471, 902 A.2d 253 (App. Div.2006), certif. denied, 189 N.J. 428, 915 A.2d 1051 (2007), we quoted with approval from the Law Division's decision in Morris County Fair Hous. Council v. Boonton Twp., 197 N.J.Super. 359, 369-71, 484 A.2d 1302 (Law Div.1984), describing the purpose of a fairness hearing:
The hearing on the proposed settlement is not a plenary trial and the court's approval of the settlement is not an adjudication of the merits of the case. Rather, it is the court's responsibility to determine, based upon the relative strengths and weaknesses of the parties' positions, whether the settlement is "fair and reasonable," that is, whether it adequately protects the interests of the persons on whose behalf the action was brought.
[Internal citations omitted.]
In Builders League, we further stated that a trial court,
[i]n making a fairness determination,. . . "must not forget that it is reviewing a settlement proposal rather than ordering a remedy in a litigated case." Armstrong *518 v. Board of Directors, 616 F.2d 305, 314-15 (7th Cir.1980), overruled on other grounds by, Felzen v. Andreas, 134 F.3d 873 (7th Cir.1998). Quoting from City of Detroit v. Grinnell Corp., 495 F.2d 448, 462 (2d Cir.1974), the Armstrong court observed that in a fairness hearing, the reviewing court "`must eschew any rubber stamp approval in favor of an independent evaluation, yet, at the same time, it must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case.'" Id. at 315.
[386 N.J.Super. at 471, 902 A.2d 253.]
The "nature and extent of the hearing required to determine whether the settlement is `fair and reasonable' rests within the sound discretion of the court." Morris County Fair Hous. Council, supra, 197 N.J.Super. at 370, 484 A.2d 1302.
We agree that the trial court abused its discretion in denying the objectors' request for a testimonial hearing, particularly with respect to Waters. We are convinced that Waters' report should have been tested by cross-examination. In that way, the court would have been better able to assess the fairness of the settlement proposal, which was based upon Waters' valuations. Although the court did an extensive review of the settlement, it relied upon Waters' "valuation . . . despite the fact that [it] ha[d] some concerns about her overall accuracy." Given its earlier determination that a Rule 104 hearing would be necessary before Waters' testimony could go to a jury and its reservations about her accuracy, the court should have heard testimonial evidence and allowed the objectors an opportunity to cross-examine her. Accordingly, we are remanding the matter for a testimonial fairness hearing.

V
With respect to attorneys' fees, the court, again relying on Waters' valuation of the settlement, determined that the proposed fee award of $6 million, plus $500,000 for unreimbursed costs, "represents about 16.7% of the value of the settlement.. . . This percentage falls squarely within the range of reasonable fees in class action cases. Perhaps even more importantly, the payment of fees to Class Counsel in no way reduces the benefits to the class members. This may call into question the value of the comparison but certainly does not weigh in favor of rejecting the settlement."
Appellants argue that class counsel represented it spent "`approximately 3,500 hours' on the case, without presenting documentation to support the claim." Appellants maintain that the $6 million fee divided by 3,500 hours represents an hourly rate in excess of $1,700. Even in the New York/New Jersey metropolitan area, that is extraordinary in our view.
"[A] thorough judicial review of fee applications is required in all class action settlements." In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litg., 55 F.3d 768, 819 (3d Cir.), cert. denied sub nom, GMC v. French, 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995). This is because "`a defendant is interested only in disposing of the total claim asserted against it [and] the allocation between the class payment and the attorneys' fees is of little or no interest to the defense.'" Id. at 819-20 (quoting Prandini v. Nat'l Tea Co., 557 F.2d 1015, 1020 (3d Cir.1977)). Further, the "divergence in financial incentives. . . creates the `danger . . . that the [class] lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment for fees.'" Id. at 820 (quoting Weinberger v. Great N. Nekoosa Corp., *519 925 F.2d 518, 524 (1st Cir.1991)). Consequently, there is an "especially acute need for close judicial scrutiny of fee arrangements" in class actions. Ibid.
A court may consider two different methods for determining class action fees: the lodestar method and the percentage of recovery method. Id. at 820-21. Each has "distinct attributes suiting them to particular types of cases." Id. at 821. A "court making or approving a fee award should determine what sort of action the court is adjudicating and then primarily rely on the corresponding method of awarding fees." Ibid. The ultimate choice of methodology rests within the court's discretion. Ibid.
The lodestar method is usually used in fee-shifting cases. Ibid. In this method, the number of hours reasonably expended by counsel is multiplied by an hourly rate appropriate for the region and the lawyer's experience. In re AremisSoft Corp. Sec. Litig., 210 F.R.D. 109, 128 (D.N.J.2002). A court can adjust the lodestar fee upward or downward, based upon certain factors. Rendine v. Pantzer, 141 N.J. 292, 340-43, 661 A.2d 1202 (1995).
Since the lodestar method is not related to the amount recovered in the class action, it "assures counsel undertaking socially beneficial litigation (as legislatively identified by the statutory fee shifting provision) an adequate fee irrespective of the monetary value of the final relief achieved for the class." In re Gen. Motors Corp., supra, 55 F.3d at 821. The "decoupling" of the fee from the award to the class members "has the added benefit of avoiding subjective evaluations of the monetary worth of the intangible rights often litigated in civil rights actions." Ibid. The lodestar method works well outside the statutory fee cases where "the nature of the settlement evades the precise evaluation needed for the percentage of recovery method." Ibid.
The percentage recovery method, also known as the "common fund" method, provides that "a private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation, including attorneys' fees." Id. at 820 n. 39. "Courts use the percentage of recovery method in common fund cases on the theory that the class would be unjustly enriched if it did not compensate the counsel responsible for generating the valuable fund bestowed on the class." Id. at 821. Because there is no fee statute, common fund cases are not presumed to serve the public interest, so there is "no social policy reason that demands an adequate fee." Ibid.
Instead, the court apportions the fund between the class and its counsel in a manner that rewards counsel for success and penalizes it for failure. Courts have relied on "common fund" principles and the inherent management powers of the court to award fees to lead counsel in cases that do not actually generate a common fund. The rationale behind the percentage of recovery method also applies in situations where, although the parties claim that the fee and settlement are independent, they actually come from the same source.
[Ibid. (citations omitted).]
Under the percentage of recovery or common fund method, "a court must (1) value the proposed settlement and (2) decide what percentage of the proposed settlement should be awarded as attorneys' fees." In re AremisSoft, supra, 210 F.R.D. at 129. In valuing a settlement offer, the court must "`determine a precise valuation of the settlement on which to base its award.'" Ibid. (quoting In re *520 Gen. Motors Corp., supra, 55 F.3d at 822). In a common fund case, the trial court should consider certain factors in determining the percentage of fees awarded. Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n. 1 (3d Cir.2000). Those factors include: (1) the size of the fund created and the number of persons benefited; (2) the presence or absence of substantial objections by members of the class to the fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of non-payment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) awards in similar cases. Ibid.
Here, the court considered the Gunter factors, but relied on Waters' valuation of the settlement and did not calculate the resulting hourly rate. The court stated that this case was "not the type normally encountered in traditional common fund cases because the negotiated relief is in the form of business reforms rather than money." Thus, this case is more akin to a civil rights class action in which the lodestar method would be applied. Nevertheless, the court applied a percentage of recovery analysis without requiring a detailed affidavit of services or determining the hourly rate derived from the percentage. Moreover, an adjustment in the percentage is appropriate in a case that was settled rather than tried.
We are, therefore, persuaded that the trial court did not adequately review the counsel fee application to determine whether it was, indeed, reasonable under the circumstances of this case. Consequently, we are remanding the matter for reconsideration of the attorneys' fees awarded in light of our discussion here.

VI
We next address appellants' argument that the trial court erred in denying the medical societies' motion to intervene. We note initially that plaintiffs maintain that we should not address the merits of this argument because appellants failed to state that they were appealing from the order denying the motion to intervene. We will address the merits of this argument, however, because "[a]n appeal from a final judgment raises the validity of all interlocutory orders" previously entered in the trial court. In re Carton, 48 N.J. 9, 15, 222 A.2d 92 (1966).
In ACLU of N.J. v. County of Hudson, 352 N.J.Super. 44, 799 A.2d 629 (App.Div.2002), (citing R. 4:33-1; Meehan v. D. Partners, L.P., 317 N.J.Super. 563, 568, 722 A.2d 938 (App.Div.1998)), we articulated the four criteria for intervention as of right under Rule 4:33-1. To intervene as of right, the movant must establish the following:
(1) claim "an interest relating to the property or transaction which is the subject of the transaction," (2) show [that the movant] is "so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest," (3) demonstrate that the "[movant's] interest" is not "adequately represented by existing parties," and (4) make a "timely" application to intervene.
[Id. at 67, 799 A.2d 629]
"The substance of the rule permitting intervention as of right is . . . ordinarily construed quite liberally." Ibid. The rule is not discretionary and requires a court to approve an application for intervention if the four criteria are satisfied. Ibid.
Here, the trial court found that the societies did "not have an interest in the subject matter of the action." It stated that "the societies are not acting on behalf *521 of their own interest, but rather on behalf of their members. The societies themselves have nothing to lose or gain based on the outcome of the settlement. Therefore, they cannot make the required showing of intervention as of right."
The trial court then looked at the permissive intervention governed by Rule 4:33-2, which states:
Upon timely application anyone may be permitted to intervene in an action if the claim or defense and the main action have a question of law or fact in common. When a party to an action relies for ground of claim or defense upon any statute or executive order administered by a state or federal governmental agency or officer, or upon any regulation, order, requirement or agreement issued or made pursuant to the statute or executive order, the agency or officer upon timely application may be permitted to intervene in the action. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.
Based upon the permissive intervention factors set forth in Rule 4:33-2, the trial court denied permissive intervention because the medical societies did not move timely to intervene:
With respect to the promptness of the application, the societies have moved at a very late date. The parties have agreed to a settlement. Notice has been issued to the class members, and a date for a fairness hearing has been set for next week.
The courts have recognized that once parties have invested time and effort in settling the case, it would be prejudicial to allow intervention. . . . [I]ntervention after a proposed settlement has been reached, would render worthless all of the parties' painstaking negotiations.
This litigation began over four years ago and has received much attention. Societies and the counsel who practice exclusively as attorneys [for] health professionals most likely were aware of this litigation . . . in the past four years, could have moved to intervene at some point if they're truly concerned about the course of the litigation. Clearly the doctors involved being represented by the plaintiff firm could certainly have found out the status of the litigation or found out in discovery . . . what was going on.
However, if the court will . . . now add the societies as new parties, they will only serve to cause delay . . . and increase the probability of subsequent litigation.
Although the motion to intervene was denied, the trial court allowed the societies to appear and argue at the fairness hearing.
We are satisfied that the trial court correctly denied the intervention motion and we affirm this decision substantially for the reasons stated by the trial court on the record of December 15, 2006.

VII
In their cross-appeal, plaintiffs contend that the appeal filed by the nine medical societies represented by Wolf Block Schorr & Solis-Cohen, LLP, should be dismissed because they were non-class members who never sought to intervene in the trial court. We note, however, that this appeal is moot in light of our disposition of the appeal and is, therefore, dismissed.

VIII
In their reply brief, appellants argue that plaintiffs' appendix is improper and "appellants may not be charged for any portion of the costs attendant upon the *522 submission." We decline to address the merits of this argument since all of the parties failed to comply with the court rules governing notices of appeal, briefs and appendices and have burdened us with almost 11,000 pages of documents, many of which are not relevant to the appeal.

IX
In conclusion, after our careful consideration of the record, we are satisfied that the parties' remaining arguments lack sufficient merit at this juncture to warrant discussion in this opinion. R. 2:11-3(e)(1)(E). We summarize our decision as follows:
1. The proposed settlement agreement is remanded for a fairness hearing at which appellants may call witnesses and examine them in accordance with this decision. Respondents may call rebuttal witnesses if, in the trial court's opinion, they are necessary to present a balanced view of the proposed settlement.
2. The attorneys' fee award is remanded for reconsideration in light of the court's reliance on Waters' valuation of the proposed settlement. Moreover, the court shall consider the reasonableness of the fee in light of the hourly rate.
3. The remand is ordered without reversal of the October 24, 2006 order approving settlement. That order remains in full force and effect pending the fairness hearing on remand and a final disposition by the trial court.
4. The cross-appeal is dismissed as moot.
Remanded for further proceedings in accordance with this opinion. We do not retain jurisdiction.
NOTES
[1] Throughout this opinion the terms "appellants" and "objectors" are used interchangeably.
[2] Tagayun did not join in the appeal of the objectors and was precluded from filing a responding brief for failure to file a brief timely.